94 N.Y.2d 436 (2000)
727 N.E.2d 549
706 N.Y.S.2d 52
JAMIE MESSENGER, an Infant Under the Age of Eighteen, by Her Mother and "Next Friend," DONNA MESSENGER, Respondent-Appellant,
v.
GRUNER + JAHR PRINTING AND PUBLISHING, Also Known as GRUNER + JAHR USA, Appellant-Respondent, et al., Defendant.
Court of Appeals of the State of New York.
Argued October 14, 1999.
Decided February 17, 2000.
*437 Weil, Gotshal & Manges, L. L. P., New York City (Robert G. Sugarman and Jennifer Sclar of counsel), and Yvette Miller for appellant-respondent.
Lieberman & Nowak, L. L. P., New York City (Mitchell A. Stein and Arthur M. Lieberman of counsel), for respondent-appellant.
*438 Squadron, Ellenoff, Plesent & Sheinfeld, L. L. P., New York City (Slade R. Metcalf and Trina R. Hunn of counsel); Henry S. Hoberman; Sabin, Bermant & Gould, L. L. P. (Jerry S. Birenz of counsel); Eve B. Burton; Davis Wright Tremaine, L. L. P., Washington D.C. (Laura R. Handman of counsel); Laurence B. Sutter, New York City; Catherine R. Flickinger, Katherine J. Daniels; Robert J. Hawley; Victor A. Kovner, Alec M. Lipkind; Anne Noble Ervine, Washington D.C.; Henry L. Baumann, Jack N. Goodman, Steven A. Bookshester; Susan E. Weiner, New York City; Jan F. Constantine; Carolyn Schurr, Melville; Rene P. Milam, Vienna, Virginia; Adam Liptak, New York City, and Christopher A. Fraser for ABC, Inc. and others, amici curiae.
Geffner & Bush, Burbank, California (Leo Geffner, Joseph A. *439 Kohanski and Steven K. Ury of counsel), for Screen Actors Guild, Inc., amicus curiae.
Chief Judge KAYE and Judges SMITH, LEVINE, CIPARICK, WESLEY and ROSENBLATT concur in Per Curiam opinion; Judge BELLACOSA dissents and votes to answer certified question No. 1 in the affirmative in a separate opinion.

OPINION OF THE COURT
Per Curiam.
Plaintiff, a 14-year-old aspiring Florida model, posed for a series of photographs in New York to appear in Young and Modern (YM), a magazine for teenage girls published by defendant Gruner + Jahr Printing. Plaintiff consented to the photo shoot, but YM did not obtain written consent from her parent or legal guardian. YM used the photos to illustrate the "Love Crisis" column in its June/July 1995 issue.
The column began with a letter to Sally Lee, YM's editor-in-chief, from a 14-year-old girl identified only as "Mortified." Mortified writes that she got drunk at a party and then had sex with her 18-year-old boyfriend and two of his friends. Lee responds that Mortified should avoid similar situations in the future, and advises her to be tested for pregnancy and sexually transmitted diseases. Above the column, in bold type, is a pull-out quotation stating, "I got trashed and had sex with three guys." Three full-color photographs of plaintiff illustrate the columnone, for example, shows her hiding her face, with three young men gloating in the background. The captions are keyed to Lee's advice: "Wake up and face the facts: You made a pretty big mistake;" "Don't try to hidejust ditch him and his buds;" and "Afraid you're pregnant? See a doctor."
Plaintiff brought this diversity action in the United States District Court for the Southern District of New York, alleging, among other things, that YM violated sections 50 and 51 of the New York Civil Rights Law by using her photographs for trade purposes without obtaining the requisite consent. Defendants moved for summary judgment, arguing that they could not be held liable under the Civil Rights Law because the photographs had been used to illustrate a newsworthy column, the pictures *440 had a real relationship to the article and the column was not an advertisement in disguise. Plaintiff conceded these facts but argued that the "newsworthiness" exception did not apply because the column and pictures together created the false impression that plaintiff was the author of the letter. The District Court denied summary judgment, holding that the newsworthiness exception does not apply where the juxtaposition of a photograph to an article creates a substantially fictionalized implication.[1] The court dismissed plaintiff's additional claims for defamation, intentional infliction of emotional distress, negligent infliction of emotional distress and negligence. Following trial on the Civil Rights Law claim, the jury awarded plaintiff $100,000 in compensatory damages.
Defendants appealed to the United States Court of Appeals for the Second Circuit, arguing that the newsworthiness exception barred recovery under the Civil Rights Law. The Second Circuit observed that New York had, in older cases, recognized a "fictionalization limitation" on the newsworthiness exception (see, e.g., Spahn v Julian Messner, Inc., 21 NY2d 124, 127). The court noted, however, that our more recent cases have held that, where a photograph illustrates an article on a matter of public interest, the newsworthiness exception bars recovery unless there is no real relationship between the photograph and the article, or the article is an advertisement in disguise (see, e.g., Finger v Omni Publs. Intl., 77 NY2d 138, 141-142). Uncertain whether Finger "signaled the end of the fictionalization limitation," the Second Circuit sua sponte certified to us the following two questions, which we accepted for review (93 NY2d 948):
"1. May a plaintiff recover under New York Civil Rights Law §§ 50 and 51 where the defendant used the plaintiff's likeness in a substantially fictionalized way without the plaintiff's consent, even if the defendant's use of the image was in conjunction with a newsworthy column?"

*441 "2. If so, are there any additional limitations on such a cause of action that might preclude the instant case?"
We answer the first question in the negative, and therefore need not reach the second.

Analysis
New York does not recognize a common-law right of privacy (see, Roberson v Rochester Folding Box Co., 171 NY 538; see also, Wojtowicz v Delacorte Press, 43 NY2d 858, 860). In response to Roberson, the Legislature enacted Civil Rights Law §§ 50 and 51, which provide a limited statutory right of privacy. Section 50 makes it a misdemeanor to use a living person's "name, portrait or picture" for advertising or trade purposes "without having first obtained the written consent of such person, or if a minor of his or her parent or guardian." Section 51relevant hereprovides:
"Any person whose name, portrait, picture or voice is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided [in section 50] may maintain an equitable action * * * to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use" (internal footnote omitted).
This Court has consistently restated several basic principles concerning the statutory right of privacy. First, recognizing the Legislature's pointed objective in enacting sections 50 and 51, we have underscored that the statute is to be narrowly construed and "strictly limited to nonconsensual commercial appropriations of the name, portrait or picture of a living person" (Finger v Omni Publs. Intl., supra, 77 NY2d 138, 141; see also, Prosser, Privacy, 48 Cal L Rev 383, 402-403). Second, we have made clear that these sections do not apply to reports of newsworthy events or matters of public interest (see, e.g., Howell v New York Post Co., 81 NY2d 115, 123; Stephano v News Group Publs., 64 NY2d 174, 184). This is because a newsworthy article is not deemed produced for the purposes of advertising or trade. Additionally, these principles reflect "constitutional values in the area of free speech" (Howell v New York Post Co., supra, 81 NY2d, at 123).
Third, this Court has held that "newsworthiness" is to be broadly construed. Newsworthiness includes not only descriptions *442 of actual events (see, e.g., Freihofer v Hearst Corp., 65 NY2d 135 [details of matrimonial action]; Gautier v Pro-Football, Inc., 304 NY 354 [halftime show at football game]) but also articles concerning political happenings, social trends or any subject of public interest (see, Beverley v Choices Women's Med. Ctr., 78 NY2d 745, 752; Stephano v News Group Publs., supra, 64 NY2d, at 184). Significantly, the fact that a publication may have used a person's name or likeness "solely or primarily to increase the circulation" of a newsworthy articleand thus to increase profitsdoes not mean that the name or likeness has been used for trade purposes within the meaning of the statute. Indeed, "most publications seek to increase their circulation and also their profits" (Stephano v News Group Publs., supra, at 184-185). Whether an item is newsworthy depends solely on "the content of the article"not the publisher's "motive to increase circulation" (id., at 185; see also, Freihofer v Hearst Corp., supra, 65 NY2d, at 141).
Applying these principles, courts have held that a wide variety of articles on matters of public interestincluding those not readily recognized as "hard news"are newsworthy (see, e.g., Stephano v News Group Publs., supra, 64 NY2d, at 179-186 [picture of plaintiff wearing leather bomber jacket in column about "new and unusual products and services"]; Abdelrazig v Essence Communications, 225 AD2d 498 [picture of plaintiff in "African garb" concerned "newsworthy fashion trends in the Black community"], lv denied 88 NY2d 810; Creel v Crown Publs., 115 AD2d 414 [picture of plaintiffs illustrating guide to nude beaches]; Lopez v Triangle Communications, 70 AD2d 359, 360 ["make-over" pictures in Seventeen magazine]; Rand v Hearst Corp., 31 AD2d 406, 407-411 [quotation on book cover comparing author to plaintiff], affd 26 NY2d 806; Stern v Delphi Internet Servs. Corp., 165 Misc 2d 21, 22-27 [lewd photograph of plaintiff used in connection with promotion for internet news service]; Welch v Group W. Prods., 138 Misc 2d 856 [use of television commercial in connection with Clio awards]; Namath v Sports Illustrated, 80 Misc 2d 531, 533-535 [photographs of plaintiff in promotional material], affd 48 AD2d 487, affd 39 NY2d 897; Ann-Margret v High Socy. Mag., 498 F Supp 401, 405 [partially nude photograph of plaintiff]).
Consistent with the statutoryand constitutionalvalue of uninhibited discussion of newsworthy topics, we have time and again held that, where a plaintiff's picture is used to illustrate an article on a matter of public interest, there can be no liability under sections 50 and 51 unless the picture has no real *443 relationship to the article or the article is an advertisement in disguise (see, Howell v New York Post Co., supra, 81 NY2d, at 123; Finger v Omni Publs. Intl., supra, 77 NY2d, at 143; Arrington v New York Times Co., 55 NY2d 433, 440, cert denied 459 US 1146; Murray v New York Mag. Co., 27 NY2d 406, 409). That has been so even where a plaintiff's photograph, when juxtaposed with an article, could reasonably have been viewed as falsifying or fictionalizing plaintiff's relation to the article.
In the recent case of Finger, for example, defendant used a photograph of plaintiffs Joseph and Ida Finger and their six children to illustrate an article on caffeine-aided in vitro fertilization. Plaintiffs sought damages for defendant's use of their photograph, arguing that none of their children were conceived through in vitro fertilization, and that they did not participate in the caffeine-aided fertility project. While this Court was made well aware of the false impression potentially created by defendant's use of the photograph, we nevertheless upheld dismissal of plaintiffs' Civil Rights Law claim, repeating once again that the article was newsworthy, that there was a real relationship between the photograph and the article, and that the article was not an advertisement in disguise (see, 77 NY2d, at 142-145).
Similarly, in Arrington, the New York Times Sunday Magazine used the plaintiff's photograph without his consent "as the most prominent illustration of a feature article entitled `The Black Middle Class: Making It'" (55 NY2d, at 437). Plaintiff alleged that the article expressed views with which he did not agree and that illustrating the article with his photograph was "`distorting' * * * not only of black persons of `middle class' status generally but also of himself, as its supposed exemplar, in particular" (id. [emphasis added]). He complained that "others quite reasonably took the article's ideas to be ones he shared" (id., at 438). And, in his brief to this Court, Arrington argued, citing Binns v Vitagraph Co. (210 NY 51), that "to the extent that publication of [his] photograph * * * conveys the impression that he shares the views stated in the * * * article, it is pure fiction" that is "prohibited by the statute" (plaintiff's brief, at 19). Still, we rejected plaintiff's allegation that he was entitled to recover under the Civil Rights Law, concluding that the newsworthiness exception applied as a matter of law. We declared that plaintiff's contention that the article portrayed him in a "false light" was not cognizable, and that it would be "unwise" for the courts "to essay the dangerous task of passing *444 on value judgments based on the subjective happenstance of whether there is an agreement with views expressed on a social issue" (id., at 441-442).
Again in Murray, plaintiff's photograph, taken while attending a St. Patrick's Day Parade in green regalia, appeared on the cover of the defendant's magazine. "Directly above that photograph" was the caption, "The Last of the Irish Immigrants" (Murray v New York Mag. Co., supra, 27 NY2d, at 408). The article discussed "contemporary attitudes of Irish-Americans in New York City" (id., at 409). Although the Murray plaintiff was "not of Irish extraction" (id., at 408), we ruled that defendant was entitled to summary judgment, because the article was newsworthy and not advertising in disguise, and because a genuine relationship existed between the photograph and the article (id., at 408-410).
Thus, it is clear that a Civil Rights Law §§ 50 and 51 claim does not lie where a plaintiff's photograph is used to illustrate a newsworthy article. There are two limitations: first, there must be a real relationship between the article and the photograph (see, e.g., Thompson v Close-Up, Inc., 277 App Div 848 ["no connection" between photograph and article on dope peddling]), and second, the article cannot be an advertisement in disguise (see, e.g., Beverley v Choices Women's Med. Ctr., supra, 78 NY2d, at 752-753 [calendar was advertisement in disguise]). Of course, a Civil Rights Law claim may lie if a plaintiff's picture is used purely for trade purposes, and not in connection with a newsworthy article (see, Brinkley v Casablancas, 80 AD2d 428 [Civil Rights Law action lies for defendants' distribution of pin-up posters without plaintiff's consent]).
Applying these settled principles, we answer the first certified question in the negative. Plaintiff concedes that the "Love Crisis" column was newsworthy, since it is informative and educational regarding teenage sex, alcohol abuse and pregnancyplainly matters of public concern. Further, she concedes that the photographs bore a real relationship to the article, and there is no allegation that the article was an advertisement in disguise. Given these facts, Finger, Arrington and Murray dictate that plaintiff may not recover under the Civil Rights Law, regardless of any false implication that might be reasonably drawn from the use of her photographs to illustrate *445 the article.[2]
Notwithstanding these precedents, plaintiff contends that an action lies under the Civil Rights Law where a photograph, juxtaposed with an article, creates a "substantially fictionalized" implication. In support of this assertion, plaintiff cites two cases: Spahn v Julian Messner, Inc. (18 NY2d 324, vacated 387 US 239, adhered to on remand and rearg 21 NY2d 124 [1967]), and Binns v Vitagraph Co. (210 NY 51 [1913], supra).
In Spahn, defendants published a book entitled The Warren Spahn Story about the life of plaintiff, a famous baseball player. The book, however, was largely fiction. As was found by the trial court, the book was replete with imaginary incidents, invented dialogue, dramatized portrayals and manipulated chronologies. There was no effort and no intention to follow the facts of plaintiff's life. Defendants conducted little research, and never interviewed plaintiff, his family or any baseball player who knew him. This Court upheld a jury verdict granting plaintiff an injunction and damages pursuant to Civil Rights Law § 51, stating that although an unauthorized, truthful biography of plaintiff would be newsworthy, the protection of the newsworthiness doctrine did not extend to this "substantially fictitious biography" (18 NY2d, at 328-329). On remand from the United States Supreme Court to consider the First Amendment implications of the verdict, this Court adhered to its decision, stating that it was "unnecessary" to protect the "knowing fictionalization presented here" (21 NY2d, at 129).
Similarly, in Binns, defendant produced a film about plaintiff's role in rescuing the passengers of a shipwrecked boat. Although based on a true occurrence, the details were manufactured, and the story was "mainly a product of the imagination." This Court held that defendant's conduct was actionable under section 51, stating that although a truthful "recounting or portraying [of] an actual current event" would be protected, the film was designed to amuse the audience rather than to "instruct or educate" (see, Binns v Vitagraph Co., supra, 210 NY, at 56-59).
*446 The District Court and the Second Circuit perceived a tension between the Finger-Arrington-Murray line and the older Binns-Spahn cases, in that the older cases held that the substantially fictionalized use of a plaintiff's name or likeness may be actionable, while the newer caseswithout citing Binns or Spahnfocus on the existence of a "real relationship" and whether the work is an advertisement in disguise. Thus, the Second Circuit certified the present questions to us.
We see no inherent tension between the Finger-Arrington-Murray line and the Binns-Spahn line. Finger, Arrington and Murray, which are directly on point, state the rule applicable here. All three cases involved the unauthorized, and allegedly false and damaging, use of plaintiffs' photographs to illustrate newsworthy articles. Because the photographs illustrated newsworthy articles, because there was a real relationship between the photographs and the articles, and because the articles were not advertisements in disguise, we concluded that none of those plaintiffs stated a Civil Rights Law claim. Nor does plaintiff here.
By contrast, Binns and Spahn concerned a strikingly different scenario from the one before us. In those cases, defendants invented biographies of plaintiffs' lives. The courts concluded that the substantially fictional works at issue were nothing more than attempts to trade on the persona of Warren Spahn or John Binns. Thus, under Binns and Spahn, an article may be so infected with fiction, dramatization or embellishment that it cannot be said to fulfill the purpose of the newsworthiness exception. Here, by contrast, the "Love Crisis" column was concededly newsworthy. Thus, this case is controlled by Fingernot by Binns or Spahn.
The dissent argues that Binns and Spahn permit a plaintiff to recover if the plaintiff's name or likeness is used in a substantially fictionalized wayincluding where, as here, the use of a plaintiff's picture in juxtaposition to a newsworthy article creates a false implication (see, dissenting opn, at 449-454). This, however, conflicts with our holdings in Finger, Arrington and Murray that the use of a photograph to illustrate a newsworthy article does not state a claim under the Civil Rights Lawregardless of any false impression created by the use of the photographso long as the article is not an advertisement and there is a real relationship between the *447 photograph and the article.[3] For that same reason, the dissent is wrong to assert that our discussion in Gautier v Pro-Football, Inc. (supra, 304 NY 354, 359-360), which mirrors the analysis in Binns and Spahn, controls the result here (see, dissenting opn, at 450-451). Simply, neither Binns, Spahn nor Gautier concerns the use of a photograph to illustrate a newsworthy article.[4]
Further, contrary to the dissent, it cannot be fairly argued that fictionalization was not at issue in Finger, Arrington and Murray (see, dissenting opn, at 454-455). Rather, as noted, the nub of plaintiffs' complaints in all three cases was that the use of their pictures in the articles created a false impression about them in the minds of readers. The fictionalization issue was squarely addressed in the Finger briefs (see, plaintiff's brief, at 5, 10-13; defendant's brief, at 3, 28-33), as well as in the Arrington briefs (see, plaintiff's brief, at 19). Indeed, in his brief to this Court, Arrington cited Binns for the proposition that "fiction" was actionable under sections 50 and 51 (see, id.). In response, defendant argued that, under Murray, Arrington could not recover because the picture bore a real relationship to the newsworthy article (see, defendant's brief, at 11-25). We rejected the very same claim in Arrington that plaintiff raises here: that the Civil Rights Law allows recovery where the juxtaposition of a photograph to the text is distorting in its implication that plaintiff is the subject of the article. Thus, it is clear from Finger, Arrington and Murray that when a plaintiff's likeness is used to illustrate a newsworthy article, the plaintiff may not recover under sections 50 and 51 even if the use of the likeness creates a false impression about the plaintiff. This holding applies equally in the case at hand.
Also contrary to the dissent, our result would be the same whether plaintiff were Jamie Messenger or a famous person, *448 like Shirley Temple (see, dissenting opn, at 452-453). The test is not whether plaintiff is a public or private figure. Rather, the analysis centers on whether the photograph bears a real relationship to a newsworthy article and is not an advertisement in disguise. Where those requirements are met, there is no cause of action under the Civil Rights Law.
Notably, if the newsworthiness exception is forfeited solely because the juxtaposition of a plaintiff's photograph to a newsworthy article creates a false impression about the plaintiff, liability under Civil Rights Law § 51 becomes indistinguishable from the common-law tort of false light invasion of privacy. One form in which the false light invasion of privacy tort "frequently appears is the use of the plaintiff's picture to illustrate a book or an article with which he has no reasonable connection, with the implication that such a connection exists" (Prosser and Keeton, Torts § 117, at 864 [5th ed] [emphasis added]). New York does not recognize such a common-law tort (see, Howell v New York Post Co., supra, 81 NY2d, at 123-124).
Accordingly, the first certified question should be answered in the negative, and we need not address the second.
BELLACOSA, J. (dissenting).
I respectfully disagree and would answer the first question in the affirmative. Under the analysis of the Per Curiam opinion, no matter what the published photographs of plaintiff depict or connote, if the words of the column project an abstractly newsworthy subject matter, then the judicially created newsworthiness exemption forecloses the remedy of Civil Rights Law §§ 50 and 51. This latest extension marginalizes the statutory authorization that was enacted expressly to supply potential redress for aggrandizing uses of a person's "portrait or picture."
We all agree that the courts have properly created a newsworthiness exception to liability pursuant to the Civil Rights statute. The courts have, however, also harnessed a runaway newsworthiness exemption with exceptions. Part of the puzzle here is whether there are two exceptionsadvertisement in disguise and no "real relationship"or threealso a distinctive "material and substantial falsification" prong.
A recent decision of this Court fosters the vexing implication that only two exceptions to the newsworthiness exemption exist because the case happens to mention only two (Finger v Omni Publs. Intl., 77 NY2d 138). That, in part, may explain the Second Circuit Court's quandary as to whether the *449 "substantial falsification" facet is still viable to mitigate a functionally sweeping newsworthiness immunization against the invocation of the statute.
If the "fictionalization exception" remains part of New York law, as I contend, then despite the newsworthiness of part of the published columnwhich might otherwise operate to block this plaintiff's invocation of the remedial statute against defendantsMessenger's victory before a Federal jury could be sustainable. If, on the other hand, the "fictionalization exception" is rendered a "dead letter"and newsworthiness reignsthen Messenger's Federal lawsuit is equally comatose.

I.
Civil Rights Law § 50 provides that anyone using a picture of a living person for the purposes of trade, without having first obtained the written consent of such person, or a parent or guardian, commits a misdemeanor. Civil Rights Law § 51 adds the civil damages teeth. These complementary provisions were enacted in response to early judicial reluctance against recognizing a common-law right of privacy, coupled with a judicially expressed encouragement for a legislative solution (see, Roberson v Rochester Folding Box Co., 171 NY 538 [1902]).
The Legislature acted in 1903. It also left the courts with a hefty burden of substantive interpretation that continued through the whole 20th Century, and now into Year 2000.[1] Shortly after the statutory framework came into being, this Court examined the fictionalization of a plaintiff's exploits and found defendants liable under the statute (Binns v Vitagraph Co., 210 NY 51 [1913]). The Court also warned of the difficulties of "the practical enforcement of any rule which may be adopted in construing and enforcing the statute so far as it relates to purposes of trade;" it encouraged further legislative action *450 to clarify the key phrase (Binns v Vitagraph Co., supra, at 58-59). No new enactment ensued, and the courts have continued the struggle to apply the definition of "purposes of trade."
A comprehensive exegesis emerged in 1937 in Lahiri v Daily Mirror (162 Misc 776 [Sup Ct, NY County, Sheintag, J.]). An important feature of the opinion includes an observation that "the emphasis [in cases where liability pursuant to the statute was found] was placed on dramatization rather than information" (Lahiri v Daily Mirror, supra, at 781 [emphasis added]).
Courts continued to use the "dramatization" feature to distinguish between the statute's availability or inertness. When "the total dominant impression conveyed is basically not a true picture or representation of the actual salient facts," and when the "article read as a whole, together with the headings and the pictorial representations that accompany it, constitute a sensationalized version of facts embellished with matters drawn from the author's imagination," the material may go "far beyond the scope of proper immunity pertaining to the publication of current or past news;" there, the complaint should not be stricken (Sutton v Hearst Corp., 277 App Div 155, 156-157 [1st Dept 1950], lv denied 277 App Div 873, citing Binns v Vitagraph Co., supra [emphasis added]). Also, when the photograph of a plaintiff was juxtaposed next to an article about a subject (e.g., dope peddling) with which the plaintiff had no connection, the use has been deemed for purposes of trade (Thompson v Close-Up, Inc., 277 App Div 848 [1st Dept 1950]).
Shortly after these Appellate Division decisions, this Court ruled on a statutory privacy claim stemming from the televised projection of a plaintiff who had performed during the halftime show of a professional football game. After the Court found that the telecast of the plaintiff's act had not been used for advertising purposes, this Court plumbed the definition of "use for purposes of trade" with respect to television, which, "[l]ike other media * * * may have either a trade aspect or an informative or news aspect" (Gautier v Pro-Football, Inc., 304 NY 354, 359 [1952]). The Court noted that use of a name or picture "in connection with an item of news or one that is newsworthy, is not a use for purposes of trade within the meaning of [the statute]" (Gautier v Pro-Football, Inc., supra, at 359). It cautioned, however, that there must be a "legitimate" connection between the item of news and the use of a name or *451 picture in order to remove the use from the realm of "trade" (Gautier v Pro-Football, Inc., supra, at 359, citing, inter alia, Lahiri v Daily Mirror, supra).
The Court also discretely emphasized that simply because a public figure or a presently newsworthy person is the proper subject of news or informative presentation, the newsworthy "privilege does not extend to commercialization of his personality through a form of treatment distinct from the dissemination of news or information" (id., at 359, citing, inter alia, Binns v Vitagraph Co., supra; Sutton v Hearst Corp., supra). Alluding particularly to Sutton, the Court underscored the fact that the question was whether the story "as presented to the reader" was "so embellished in the telling that it was no longer a factual report" (Gautier v Pro-Football, Inc., supra, at 360). If the story was so dramatized, its newsworthiness immunity from the operation of the statute is forfeited and lost (see, id.).
The precedential value of Gautier, amidst the nuanced history of this statute in relation to the interpretive precedents, isor should still bea matter of greater qualitative, yet not controlling, value than the majority allows.

II.
This Court enunciated a fictionalization exception to newsworthiness immunity, consistent with the seminal Gautier analysis, when it found that a substantially fictionalized biography constituted an unauthorized exploitation of the plaintiff's personality "for purposes of trade" (see, Spahn v Julian Messner, Inc., 18 NY2d 324 [1966], adhered to on rearg 21 NY2d 124). The Court recognized that even a public figure's "personality" may be "fictionalized," and as such, the baseball star's story was found to have exploited his persona for commercial value (see, id., at 328).
On reargument of Spahn in light of the United States Supreme Court's Time, Inc. v Hill (385 US 374) decision, this Court stood by its initial decision with respect to the fictionalized account of the professional athlete's life. The Court, of course, also necessarily imbued the authoritative interpretation of New York substantive law with the requisite constitutional speech protections:
"[B]efore recovery by a public figure may be had for an unauthorized presentation of his life, it must be shown, in addition to the other requirements of the statute, that the presentation is infected with material *452 and substantial falsification and that the work was published with knowledge of such falsification or with a reckless disregard for the truth" (Spahn v Julian Messner, Inc., 21 NY2d 124, 127 [1967] [emphasis added]).
The Court found that the use of "invented dialogue" to supply "a dramatic portrayal attractive to the juvenile reader" in a manner "customary" for the type of book involved did not entitle the defendants to publish such "knowing fictionalization," which was "destructive of an individual's right * * * to be free of the commercial exploitation of his name and personality" (Spahn v Julian Messner, Inc., 21 NY2d, supra, at 127-129). Thus, if there was any doubt after Gautier that the courts should make a fictionalization/falsification examination in a "purposes of trade" inquiry, Spahn II provided enduring insights. The quoted language offers significant relevance, not the ephemeral distinguishments proffered by the majority.
The protection for exploited persons against falsification or fictionalization for public figures was also extended to private individuals in Pagan v New York Herald Tribune (32 AD2d 341 [1st Dept 1969], affd without opn 26 NY2d 941 [1970]). The Appellate Division opinion summarized pertinent law regarding when the use of a name or picture falls outside the statute's meaning of "purposes of trade":
"Where a picture of an individual is published in a newspaper or magazine in connection with the presentation, without false or misleading material, of a matter of legitimate public interest to readers, and the picture bears a reasonable relationship to the presentation, the use of the picture in the publication is not actionable as a use for the purpose of advertising or trade within the prohibition of the statute unless the presentation is in effect an advertisement in disguise" (Pagan v New York Herald Tribune, supra, at 343 [emphasis added]).
If a Shirley Temple-like set of photos were used with this identical column, that would more than likely be actionable, as trading on the persona of a famous individual. The 14-year-old plaintiff adolescent, a private person who cannot even legally give consent to the use of her photos, should have no less a remedy for someone trading on her persona and aspirations, the particular protection tendered by the statute. This contrast dramatizes the irony of a real tension, as I see it, between the *453 extant precedential lines and a growing atrophy of the Civil Rights statute.

III.
This Court more recently has had an opportunity to examine the Civil Rights Law in the context of a series of cases that analyzed essentially only the "no real relationship" exception. A magazine cover depicted a plaintiff, not of Irish extraction, in a St. Patrick's Day Parade, with the title of the feature article, "The Last of the Irish Immigrants" (Murray v New York Mag. Co., 27 NY2d 406 [1971]). The opinion addressed only the question "`whether the plaintiff's photograph has some relevance to the article'" (id., at 408), but part of Murray has become the resounding sound bite for Civil Rights Law §§ 50 and 51 jurisprudence as follows:
"`A picture illustrating an article on a matter of public interest is not considered used for the purpose of trade or advertising within the prohibition of the statute * * * unless it has no real relationship to the article * * * or unless the article is an advertisement in disguise'. (Dallesandro v. Holt & Co., 4 A D 2d 470, 471, app. dsmd. 7 N Y 2d 735; see, also, Pagan v. New York Herald Tribune, 32 A D 2d 341, affd. 26 N Y 2d 941 * * *)" (Murray v New York Mag. Co., supra, at 409).
However, as sound bites are often misleading due to their lack of context, so too is Murray's extrapolation from Dallesandro. A careful tracing of the Dallesandro material that has popped out as "the quotable quote" from Murray reveals that Dallesandro faithfully cited to and relied on the seminal whole-cloth of Gautier:
"A picture illustrating an article on a matter of public interest is not considered used for the purpose of trade or advertising within the prohibition of the statute (Gautier v. Pro-Football, 304 N. Y. 354, 359) unless it has no real relationship to the article (Thompson v. Close-Up, 277 App. Div. 848), or unless the article is an advertisement in disguise (Griffin v. Medical Soc. of State of N. Y., 7 Misc 2d 549)" (Dallesandro v Holt & Co., 4 AD2d 470, 471).
All the pieces are pivotal, in my view, for a plenary appreciation of the jurisprudence affecting the instant controversynot *454 just the latest cases, as the majority posits. As I have pointed out, Gautier emphasized separately the importance of dramatization or fictionalization when analyzing whether a use was "for purposes of trade," an inquiry distinct from, yet not divorced from, the real relationship issue. This citation to Gautier was not crucial in Murray, where the only question was whether the photograph was reasonably connected to the article (see, Murray v New York Mag. Co., 27 NY2d 406, revg 35 AD2d 557). But the faithful link to Gautier in Dallesandro has simply gotten lost along the way.
Additionally, Murray also extracts from Pagan a quotation pertinent to the Murray issue, to wit, "that picture was published * * * `in connection with the presentation * * * of a matter of legitimate public interest to readers'" (27 NY2d, at 409). Again, this excerpt summarized the state of New York law as far as was concerned in Murray, replacing with ellipses the material that, because of the limited nature of the inquiry in Murray, was not necessarily aptunlike in the instant case. Indeed, the omitted language is key herethe presentation must be made "without false or misleading material" (Pagan v New York Herald Tribune, 32 AD2d 341, 343, affd without opn 26 NY2d 941, supra).
The abbreviated use of excerpts from the line of precedents is understandable in Murray and more recent cases involving "real relationship" core problems (see, Arrington v New York Times Co., 55 NY2d 433 [1982]; see also, Stephano v News Group Publs., 64 NY2d 174, 184-185 [1984]). The truncated use, however, must be recognized and reconciled to provide a thorough understanding of the applicable principles.
The most recent and next significant Court of Appeals development analyzing the "no real relationship" issue is the case that seems to have sealed the Second Circuit Court of Appeals' need to certify to this Court its uncertainties about the state of New York law (Finger v Omni Publs. Intl., 77 NY2d 138 [1990]). In the briefs to this Court, the Finger plaintiffs urged one question only"whether a real relationship existed between the photograph * * * and an article dealing specifically with caffeine enhanced in vitro fertilization." The plaintiffs only tangentially touched on the falsification question, while they relied primarily on Arrington and Murray. They urged that the story "is of such a tenuous nature that it creates the false and misleading perception that [the] family was conceived using in vitro fertilization or caffeine enhancement techniques."
*455 Indeed, this Court considered the plaintiffs' argument as one of purely "`no real relationship'" (Finger v Omni Publs. Intl., supra, at 142; compare, Davis v High Socy. Mag., 90 AD2d 374; Lerman v Flynt Distrib. Co., 745 F2d 123 [examining precedent of this Court that supports the substantial fictionalization premise and exception]). Since the Finger plaintiffs hinged the false perception argument on the premise that there was no real relationship, once the Court determined that a real relationship existed, the Court ended the analysis. It did not have to take the further step implicated point-blank in this caseto address the falsification issue. Because the majority essentially subsumes this step, I disagree with its analysis leading to the negative answer to the first certified question.
The fact that Finger did not purport to address the falsification issue could support the argument that this third exception did not survive Finger. The answer, however, to the Second Circuit's question of whether Finger mutes the Spahn falsification exception may more reliably be found, I respectfully submit, by nimble, precise tracings to the authority sources found within Finger itself. Finger continues the scrunched Murray-Dallesandro snippet that replaced with ellipses Dallesandro's reference to Gautier (Finger v Omni Publs. Intl., supra, at 142). Intriguingly, however, Finger also cites to page 185 of the Stephano opinion. This important reference contains (1) the citation to the page in Gautier, which, citing to Sutton, issued the admonition against dramatization or fictionalization, and (2) the citation to Pagan, which extended the fictionalization concern to private persons. The failure to discuss Spahn, the most obvious fictionalization precedent, in Finger is thus explained away for me, though my over-all view is summed up by the majority as a misinterpretation. Spahn, unlike Finger, involved a public figure. The reference, instead, to a case that relied on Pagan is far more revealing. Pagan essentially tells us that if a purveyor is going to present the photograph of an individual, even in conjunction with a newsworthy item, the presentation must be legitimately made "without false or misleading material" (Pagan v New York Herald Tribune, supra, at 343). That is still good law and supports the affirmative answer I would give to the question posed in relation to this controversy.
In any event, the substantive law question of this case was simply not the dispositive or necessarily implicated thrust in Finger. Thus, the instant case is also demonstrably distinguishable from Finger on its facts and import. In Finger, "[n]either *456 the article nor the caption mentioned plaintiffs' names or indicated in any fashion that the adult plaintiffs used caffeine or that the children were produced through in vitro fertilization" (Finger v Omni Publs. Intl., supra, at 140 [emphasis added]).
Here, the caption juxtaposed next to and across a large picture of Jamie Messenger, looking "hung over," states, "I got trashed and had sex with three guys * * * Even worse, I heard them laughing about it the next day" (emphasis added). The smaller caption within the photograph with Messenger reads, "You made a pretty big mistake" (emphasis added). Another caption within another picture of Messenger looking distraught reads, "Afraid you're pregnant?" (emphasis added). These captions, "pull quotes" and photographs leap off the page with the real relationship to the published materialwhich is not contestedbut also with the substantial falsification of the photographs in the kind, manner and degree to which they were exploited. In Finger, there was no indication in any fashion that the plaintiffs in the associated picture had experienced what was described in the content of the article. In this case, that very linkage is soldered together and dramatized. In my opinion, that is what takes this case over tolerable lines and limits.
Here, a Federal court jury found that reasonable readers would think Messenger was unquestionably the subject and signatory of an ersatz letter. Despite the abstracted public-interest newsworthy quality of the editor's answer to the letter, the falsified connection"I got trashed"personalizes the matter in a devastating fashion. Even though the column enjoys the academic quality of a newsworthy subject matter, its presentation publicly paraded plaintiff as the epitomized subject for sensationalized impact.[2] That should not be immune from the statute's reach.
I am unable to discern support in this Court's developed line of analysisuntil todayfor the conclusion that this substantially fictionalized portrayal of Messenger's likeness is beyond the statute's ken just because something about it is newsworthy in a general way. That, as I understand itor misinterpret it, as the majority characterizes my viewis the bottom line of *457 the majority's negative answer transmitted to the Second Circuit. For me, New York law supports a more nuanced and generous approach to the applicability of this now largely immobilized statute that is functionally and realistically foreclosed by today's ruling (see, Binns v Vitagraph Co., supra; Gautier v Pro-Football, Inc., supra, citing Sutton v Hearst Corp., supra; Spahn I, supra, and Spahn II, supra; Pagan v New York Herald Tribune, supra; Stephano v News Group Publs., supra; see also, Lerman v Flynt Distrib. Co., supra; Davis v High Socy. Mag., supra).
In sum, the practical and theoretical consequence of the negative answer justifies a too-facile escape valve from the operation of the statute, one that is also unilaterally within the control of the alleged wrongdoer. The paradigm for editors is a "newsworthy" homily to lovesick adolescents or any other audience; they then just have to use a journalistic conceit of tieing the advice to a purported letter to the editor, with an inescapable first person identification of the letter as originating with any adolescent in the photo array. When an aggrieved person like Messenger reaches for the statutory lifeline, the newsworthiness notion dissipates it into a dry mirage. That is not fair or right.
Strong New York jurisprudence and protection of constitutional speech guaranteesthat I too supportare urged as overarching policy reasons for courts to be very circumspect with respect to claims under the Civil Rights statutes. That should not be a preemptive justification for courts to neutralize, in functional applications, a remedial statute that this Court nudged into existence. In the endeavor to live up to this Court's and New York's robust tradition of free speech and free press protections, statutory rights and reputations of individuals can also be proportionately safeguarded and legitimately redressed.
Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.17 of the Rules of the Court of Appeals (22 NYCRR 500.17), and after hearing argument by counsel for the parties and consideration of the *458 briefs and the record submitted, certified question No. 1 answered in the negative and certified question No. 2 not answered.
NOTES
[1] Plaintiff also sought to introduce evidence that the article itself was substantially fictionalized in that the letter had in fact been invented by YM's editorial staff. The District Court, however, barred plaintiff from exploring this subject at trial, holding that the only inquiry relevant to plaintiff's Civil Rights Law § 51 claim was whether the juxtaposition of the photographs to the articlenot the article itselfwas substantially fictionalized. The fictionalization alleged was that the use of the photograph in conjunction with the article conveyed the false impression that plaintiff was the author of Mortified's letter and had the experiences described in it.
[2] We have not been asked to, and do not, pass on the question whether a reasonable reader could conclude that plaintiff was the person identified as "Mortified," given that the pictures were obviously contrived and she was not identified as the author of the letter (see, University of Notre Dame Du Lac v Twentieth Century-Fox Film Corp., 22 AD2d 452, 455 [reasonable viewers would know that "they are not seeing or reading about real Notre Dame happenings or actual Notre Dame characters"], affd 15 NY2d 940).
[3] As is evident from its opening, the dissent misinterprets our decision. We do not hold that the newsworthiness exception forecloses liability under the Civil Rights Law whenever "the words of the column project an abstractly newsworthy subject matter" (see, dissenting opn, at 448). Rather, we hold only that there is no Civil Rights Law action for a photograph illustrating a newsworthy article if there is a real relationship between the photograph and the article, and the article is not an advertisement in disguise. Our holding follows settled law and neither marginalizes nor immobilizes the statutory remedy.
[4] Because Gautier remains good law, there is no significance to the Murray Court's use of an ellipsis to pass over a citation to Gautier in a quote from Dallesandro v Holt & Co. (4 AD2d 470, 471, appeal dismissed 7 NY2d 735) (see, dissenting opn, at 455). Indeed, Dallesandro cited Gautier for an uncontested general principle, and the Murray Court's use of the ellipsis did not alter the meaning of the Dallesandro passage.
[1] A prescient Law Review note in 1990 suggested "that New York's continued refusal to recognize a common-law right to privacy is becoming increasingly troublesome as the twenty-first century draws near and the threat to individual privacy mounts with the emergence of new technologies capable of ever more intrusive applications. In addition, this Note will assert that this refusal to recognize a right to privacy is rendered all the more distressing by the fact that, despite the extraordinary number of privacy-related cases that have filtered through the New York courts, there is an undeniable paucity of decisions in which the courts have satisfactorily explained the reasoning behind this continued refusal to embrace a right so fundamental to American society" (Note, The Right to Privacy One Hundred Years Later: New York Stands Firm as the World and Law Around it Change, 64 St John's L Rev 315, 323).
[2] The resolution of the Federal appeal and the answer to the certified questions are complicated further by the District Court ruling which precluded the plaintiff's proof and evidence with respect to a bifurcated fictionalization in relation to the published verbiage, as distinguished from the photographs themselves in their juxtaposition to the texts.