OPINION OF THE COURT
Paul Wooten, J.
In this action for intentional infliction of emotional distress, *231 defamation and violations of Civil Rights Law §§ 50 and 51, defendant Curtis James Jackson III, also known as 50 Cent, moves, pursuant to CPLR 3212, for summary judgment dismissing the complaint. Plaintiff Lastonia Leviston opposes the motion, except that she agreed to withdraw her third cause of action for defamation, and has done so.
Background
Jackson, who goes by the name 50 Cent, is a well-known rap musician. He maintains that in 2009 he was involved in a “rap war” with nonparty Rick Ross, another rap musician (see Jackson’s amended mem of law in support at 3). As Jackson describes it, rap wars, or beefs, are common in the rap and hip hop culture, and involve irritating other artists to create more interest, develop more awareness for themselves and create competition, or battles, as to who can create material “up to standard” quickly (Jackson examination before trial [EBT] at 13-14). As part of his rap war with Ross, Jackson posted several videos on his website, thisis50.com. Those videos mocked Ross, generally through a character Jackson created called “Pimpin’ Curly,” Jackson’s alter ego. Ross started calling Jackson “Curly” during their rap war, and Jackson added the name “Pimpin’ ” to mock Ross and as a result of a dispute with someone else. The videos were uploaded to a YouTube channel that Jackson’s employees created in 2008.
Ross is the father of Leviston’s younger daughter. At the time that Leviston was involved with Ross, Ross had not yet become well-known or financially successful. Ross is also the father of another child, whose mother, Tia Kemp, went to Jackson’s offices in New York during Jackson’s rap war with Ross. Jackson created a video in which he interviewed Kemp, who alleged that Ross was not taking care of his child or paying child support. Jackson made two other videos with Kemp. Those videos were also posted on YouTube.
In 2008, Leviston, who lived in Florida, testified that she met nonparty Maurice Murray in New Jersey (opposition, Leviston EBT, exhibit A at 36). On June 30, 2008, Leviston and Murray filmed themselves having sex at Murray’s apartment in Newark, New Jersey, using Murray’s camera (the videotape) (id. at 66-67). According to plaintiff, the two agreed that the videotape would be kept private, just for their own use (id. at 69). Levis-ton and Murray broke up twice, and each time they discussed either giving the videotape to Leviston or destroying it. The *232 first time they broke up was around Labor Day in 2008. They reconciled in January of 2009, at which time Leviston tried unsuccessfully to find the videotape, which Murray said he could not find (id. at 84-88). Leviston maintains that June 30, 2008 was the only time that she was ever videotaped engaging in sex (id. at 70). She denied ever being a call girl or companion, although she acknowledged posing for a magazine that included her photograph as that of a call girl, by the name of “Brooke.”
Some time during the first half of March 2009, Murray brought the videotape to Jackson, whom he had never previously met (opposition, Jackson EBT, exhibit C at 15). Jackson testified that he never had any contact with Leviston, nor did he speak to her about the videotape {id. at 77). Upon viewing the videotape, Jackson stated that he recognized Leviston as the mother of Ross’s daughter {id. at 17), and gave the videotape to his computer person, Christopher Singh, also known as Broadway, who took material off the tape and converted it into digital format so that it could be saved to his computer and edited {id. at 34-35; opposition, Singh EBT, exhibit E at 37).
Jackson testified that he decided to inject his character, “Pimpin’ Curly,” into the videotape, and performed a skit that was spontaneous and not rehearsed (opposition, Jackson EBT, exhibit C at 35-37). Singh ran the camera, and edited the videotape, blurring Murray’s face in order to protect his identity, yet Leviston’s face was not blurred (opposition, Singh EBT, exhibit E at 41-42; Corentin Villemeur EBT, exhibit D at 77). On the tape, Jackson states that he paid for the videotape, which he reasserted in a radio interview with Tim Westwood that he “paid a few dollars” (opposition exhibit H at 5). However, at his deposition, he denied paying for it (opposition, exhibit C at 76-77, 102-103).
Jackson placed a trailer for the video on his website, thisis50.com, on or before March 12, 2009. The website is owned by Jackson, and he makes money from it through advertisers. The site attracts millions of visitors every year. Jackson also used the Twitter page of his newly created other website, boobootv.com, to promote the trailer and the full length videotape. The trailer was picked up and posted on another website, worldstarhiphop.com, the same day, and it also appeared on the same date on boobootv.com. Boobootv.com does not have advertisers, and Jackson testified that he created it in order to be able to post the edited videotape on a site that had no advertising.
The following evening, March 13, 2009, the edited videotape went live on the Internet, and was picked up by many websites. *233 Jackson maintains that Ross is the one responsible for the release of the videotape because he somehow obtained it from an email account, either an account of G-Unit Records, which is Jackson’s record company, or one of his employee’s personal accounts (exhibit C at 55), and released it on his website thisissabrinassin.com before Jackson had a chance to release it. Jackson stated that he does not know how Ross obtained the videotape from the account it was contained in, nor does he know for sure that Ross broke into the account (exhibit C at 40-41). In their EBT testimony, neither Jackson nor any of his computer employees testified to having any knowledge or evidence that Jackson’s computers had been hacked (exhibit C at 139-140; exhibit D at 104; exhibit E at 68-69). Singh testified that the videotape was first made accessible on the Internet through the website deeperthanrap.com and thisissabrinassin.com (exhibit E at 50). The people working at Jackson’s office were surprised to see it on the Internet at the time, but there was no investigation into how the videotape was leaked (id. at 68).
Leviston’s forensic computer expert, Steve Burgess, viewed the full, 13-minute edited videotape on hollyhoodtv.com, thisissabrinassin.com (allegedly Ross’s website), worldstarhiphop.com, thisis50.com, showhjpe.com, rapbasement.com, boobootv.com, areyouinthatmoodyet.com and pornhub.com. Thisis50.com had a link to be redirected to boobootv.com to watch the videotape. On July 7, 2011, Burgess also viewed the videotape on the website worldstaruncut.com, where the counter next to the videotape reflected that there were 3,233,369 hits on the videotape (exhibit M [PL00412]).
Leviston kept a diary during the period immediately prior to and after the release of the videotape. She testified that she found out about the existence of the edited videotape on her birthday, March 11, 2009. The diary reveals that Leviston entertained suicidal ideation as a result of the release of the videotape, and that she was unable to function normally in her daily life. Leviston began treatment with Dr. Woodrow Wilson, a licensed psychologist in the State of Florida, on April 3, 2009 (opposition exhibit T, exhibit 15 at PL0083-PL0087). He states that he has extensive experience treating patients with post-traumatic stress disorder (PTSD). Dr. Wilson diagnosed Levis-ton with PTSD as a result of the exposure of the videotape, as well as major depressive disorder which flowed from the PTSD (exhibit T at 60, 93-94, 113-118, 131-132, 138).
In October 2011, Leviston was evaluated by Dr. Louise Fitzgerald, a clinical forensic psychologist and Emeritus Profes *234 sor at the University of Illinois (opposition exhibit U, appendix D). Dr. Fitzgerald diagnosed Leviston with severe major depressive disorder, with anxiety disorder not otherwise specified, with all the symptoms and impact of PTSD (id. at 35-36). Dr. Fitzgerald concluded that the release of the videotape exacerbated her conditions. Dr. Fitzgerald stated that the fact that Leviston was able to obtain her GED, attend classes, and go to work is not inconsistent with the diagnosis of her depression (id. at 59-63).
Discussion
Civil Rights Law §§ 50 and 51
Leviston alleges in her first cause of action that defendant used her name and/or picture in violation of Civil Rights Law §§ 50 and 51. In order to establish a claim under Civil Rights Law §§ 50 and 51, a plaintiff must demonstrate that the defendant used the plaintiffs name, portrait, picture or voice in the State of New York for purposes of advertising or trade, without the plaintiffs written permission (Molina v Phoenix Sound, 297 AD2d 595, 597 [1st Dept 2002], citing Civil Rights Law § 51; Guerrero v Carva, 10 AD3d 105 [1st Dept 2004]). “Civil Rights Law § 51 authorizes a civil action for injunctive relief and damages, including exemplary damages if a defendant acts knowingly in violation of that protection” (Beverley v Choices Women’s Med. Ctr., 78 NY2d 745, 750 [1991]). Under Court of Appeals precedent, “the statute is to be narrowly construed and ‘strictly limited to nonconsensual commercial appropriations of the name, portrait or picture of a living person’ ” (Messenger v Gruner + Jahr Print. & Publ., 94 NY2d 436, 441 [2000], citing Finger v Omni Publs. Intl., 77 NY2d 138, 141 [1990]). Here, there is no dispute that the videotape was made available in New York, and that Leviston did not provide any written consent for its use.
“A use for advertising purposes has been defined as a use in, or as part of, an advertisement or solicitation for patronage” (Flores v Mosler Safe Co., 7 NY2d 276, 284 [1959]). Jackson maintains that the posting of the videotape was not for advertising purposes, as evidenced by the hasty construction of the boobootv.com website, which did not have any advertisers nor did it sell any products. Thus, defendant argues that, in posting the videotape, he took significant steps to avoid attracting trade or to advertise. He claims that his sole motive was to respond to Ross’s “disrespecting” him.
It cannot be said that the posting of the videotape was for advertising purposes as Jackson did not use it to solicit patron *235 age nor did he use it to advertise or promote his music. Additionally, and similar to McGraw v Watkins (49 AD2d 958 [3d Dept 1975]), plaintiff has made no allegations that Jackson profited off of the videotape, or that he charged anything to view the videotape. However, the fact that no advertising was involved is only one inquiry. The question remains whether it was used for trade purposes, which is separate from advertising purposes (see Beverley v Choices Women’s Med. Ctr., 78 NY2d 745, 751 [1991]). Further, a plaintiff cannot recover under section 51 if the use to which his or her image was put is in the context of reporting a newsworthy incident, even if it also serves a trade purpose (Stephano v News Group Publs., 64 NY2d 174, 184 [1984]).
Here, it cannot be said that the dissemination of an explicit sexual videotape was newsworthy, despite defendant’s argument to the contrary. Even if one could strain the definition of newsworthy to include the fact that there was such a tape, posting an explicit sexual tape cannot be included in a newsworthy category. The inquiry, therefore, is whether the videotape was promoted and made available in order to attract people to Jackson and/or helped Jackson to make a profit (Rall v Hellman, 284 AD2d 113, 114 [1st Dept 2001]). There is evidence that the trailer and the videotape boosted traffic on some of the websites where the videotape was posted. However, as Jackson and Singh testified, the intent behind the videotape was to respond to Ross’s disrespectful comments, and boobootv.com was created without advertisement content specifically for posting the videotape.
Additionally, Jackson relies on the case McGraw v Watkins (49 AD2d 958, 959 [3d Dept 1975]). In McGraw, plaintiff agreed to pose nude for artistic photographed poses to be used in a movie that the defendant was producing, and she executed a release valid against any claims pursuant to Civil Rights Law §§ 50 and 51. Shortly after the scenes had been filmed, plaintiff changed her mind and obtained a written agreement from the defendant that voided the release that plaintiff had signed, and which stated that defendant would not “utilize, publish or exhibit the photographed poses of plaintiff in his film, nor show them to any other person” (McGraw, 49 AD2d at 958). However, the plaintiff alleged in her complaint that, despite this agreement, defendant included a nude scene of plaintiff in his film and had publicized and exhibited the film to people known to plaintiff and others, as well as shown other poses of plaintiff *236 that were not included in the film (id.). The Court found that the plaintiffs claim did not fall within the “prohibitive provisions” of Civil Rights Law §§ 50 and 51 (id. at 959). Specifically, it was noted that plaintiff did not demonstrate in her pleadings and motion papers that the plaintiffs picture had been used for advertising or trade purposes, nor did plaintiff allege that the defendant made a charge for any of the alleged exhibitions of the film.
Leviston proffers that, as a part of the 50 Cent brand, Jackson has created approximately 10 different video skits in his character as Pimpin’ Curly and mocked Ross. Additionally, as part of the beef with Ross, Leviston maintains that Jackson has created a series of animated cartoons also posted on YouTube called “Officer Ricky” (see Leviston mem of law at 5). Further, plaintiffs forensic computer expert, Burgess testified at his deposition that thisis50.com had a traffic rank of 3,100 on March 14, 2009 (Burgess EBT, exhibit K, at 163 lines 11-12), and that the videotape posted on worldstarhiphop.com had 468,222 views as of the date that he printed out the exhibits of screen shots used at his deposition (id. at 183-184 [PL414 and PL415]). Furthermore, Burgess testified that on worldstaruncut.com, the counter next to the videotape reflected that there were 3,233,369 hits on the videotape as of the date he printed out the screen shot of the website for his deposition.
The court finds plaintiff’s arguments and Burgess’ testimony unpersuasive as it relates to websites where the videotape was posted where no commercial connection exists between said websites and Jackson, i.e., worldstaruncut.com and worldstarhiphop.com (see Rall v Hellman, 284 AD2d 113, 115 [1st Dept 2001] [“what is alleged (in the complaint) is that defendant utilized the criticism in order to generate ‘discussion’ on a Web site, a site to which defendant was not even alleged to have been commercially connected. This is hardly a basis to assert Civil Rights claim”]). However, plaintiff does put forth testimony from Burgess regarding thisis50.com and boobootv.com, which are websites run by and affiliated with Jackson and his record company. Burgess testified regarding a Google analytics report showing a graph that shows a spike in visits to boobootv.com around the date that the videotape was posted, wherein the website received about 13,000 hits and, by the 30th of March, the number of hits decreased significantly (Burgess EBT at 230-237). The same is true for thisis50.com, wherein *237 Burgess testified that a Google analytics report showed that traffic on the site spiked to its highest level between February 10, 2009 and April 15, 2009, wherein the visitors dropped off after that time period (id. at 306). Thus there is evidence that the posting of the videotape on these websites generated interest in Jackson. The record reveals that Jackson had an ongoing rap war with Ross, and used it to generate interest in himself and to attract viewers to his website, which qualifies as a trade purpose. Thus, it cannot be concluded as a matter of law that there was no trade purpose involved in posting the videotape, and defendant has failed to establish his entitlement to summary judgment on this cause of action.
Intentional Infliction of Emotional Distress
In the second cause of action, Leviston alleges that Jackson’s actions in posting the videotape caused her severe emotional distress. The elements of a cause of action for the intentional infliction of emotional distress are: “(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress” (Howell v New York Post Co., 81 NY2d 115, 121 [1993]).
Jackson maintains that this cause of action must fail because Ross first publicized the videotape on the Internet, and, therefore, a nonparty’s actions were the sole proximate cause of Leviston’s distress (see Wojtasik v State of New York, 48 AD3d 1129, 1130 [4th Dept 2008]). He further contends that there is a lack of medical evidence of Leviston’s emotional distress, or indeed any adequate evidence of such distress, which is fatal to her claim. It is noted that, in the context of this motion, Jackson does not dispute that the posting of the videotape qualifies as extreme and outrageous conduct. Nor does he dispute that he disregarded a substantial probability that posting the videotape would cause extreme emotional distress. Thus, the only issue on which this summary judgment rests is whether Jackson caused Leviston severe emotional distress. Jackson maintains that there was no causation because Ross initially posted the videotape, and that Leviston has failed to produce adequate evidence of severe emotional distress.
Jackson first contends that the evidence demonstrates that Ross, not Jackson, first posted the videotape. Even allow *238 ing that Ross posted it first,* however, Jackson’s further argument that Leviston “would never have known about the version Mr. Jackson created, let alone suffered any distress from it” had Ross not posted it (amended mem of law at 14) is unsupportable. There is no question that, before the videotape was posted, Jackson had posted the trailer on thisis50.com. Leviston knew about the trailer, and was already upset by knowing that both the trailer and the videotape would be available on the Internet, before the videotape, or even the trailer, was posted. Further, there is little doubt that Ross would not have posted it had it not been obvious that Jackson was prepared to post it, and in fact did post a link to it approximately an hour after Ross posted it. Consequently, Jackson has failed to demonstrate that Ross’s posting of the videotape an hour prior to Jackson posting a link to that tape was the sole proximate cause of Leviston’s injury.
Jackson’s next basis for seeking summary judgment on this cause of action is his assertion that Leviston has failed to demonstrate that she suffered extreme emotional distress. He offers evidence that she obtained her GED and held two jobs during this time period, which, he claims, demonstrates that she did not suffer extreme emotional distress. He also relies on the fact that Leviston did not seek counseling until her attorneys directed her to do so and recommended a psychologist.
While it is true that Leviston’s attorneys recommended her psychologist, it is also noted that she first saw Dr. Wilson approximately three weeks after the videotape first appeared on the Internet. However, such is not the case regarding Dr. Fitzgerald. Leviston put forth reports from Dr. Wilson and Dr. Fitzgerald who both concluded that she was suffering from a major depressive disorder and demonstrated symptoms of PTSD, which they both concluded stemmed from the posting of the videotape. However, Jackson proffers that Leviston did not present any medical evidence of physical harm to support her claim, and relies on the First Department case, Walentas v Johnes (257 AD2d 352, 353 [1st Dept 1999]), which states that “[t]he plaintiff is required to establish that severe emotional distress was suffered, which must be supported by medical evidence, not *239 the mere recitation of speculative claims” (citations omitted). Jackson proffers that plaintiff acknowledges that she suffered no physical injury and relies solely on psychological harm in support of this cause of action.
This is a case of first impression wherein the defendant does not dispute that the action complained of qualifies as extreme and outrageous conduct, and also does not dispute that he disregarded a substantial probability that the action complained of would cause extreme emotional distress. Thus, the only issue on this claim for summary judgment is whether Jackson caused Leviston severe emotional distress.
The case at bar does not fall within the narrow line of cases where a plaintiff need not submit medical evidence to support her injuries when the claim is inherently genuine for purely emotional harm (cf. Plunkett v NYU Downtown Hosp., 21 AD3d 1022, 1022-1023 [2d Dept 2005] [“plaintiffs’ action to recover for the emotional injuries flowing from the defendant’s alleged unwarranted delay in notifying them of their father’s death and its interference with their right to the possession of his remains”]; Garcia v Lawrence Hosp., 5 AD3d 227, 227-228 [1st Dept 2004] [“(p)laintiff alleges that defendant hospital brought her day-old baby to her for breast-feeding after she had been medically sedated; that the sedative caused plaintiff to fall asleep on top of the baby, smothering him to death” after the defendant left them alone unsupervised]; see also Lando v State of New York, 39 NY2d 803 [1976]).
Here, there is testimony from both Leviston’s treating psychologist and from Dr. Fitzgerald that they engaged in testing plaintiff, and the results of those tests support her claim of mental and emotional distress. Leviston’s diary and her testimony further confirm her emotional distress and suicidal thoughts. These verified emotional and mental symptoms, under these circumstances, are sufficient to rebut Jackson’s motion for summary judgment on this cause of action. Furthermore, whether plaintiffs mental suffering was genuine and extreme is a question for the jury (see Halio v Lurie, 15 AD2d 62 [2d Dept 1961]; Murphy v Murphy, 109 AD2d 965, 966 [3d Dept 1985]). As such, the portion of defendant’s motion is denied.
Defamation
Leviston withdrew her cause of action for defamation. Therefore, that portion of defendant’s motion for summary judgment is moot.
*240 Conclusion
Accordingly, it is hereby ordered that plaintiffs cause of action for defamation is permitted to be withdrawn; and it is further; ordered that the defendant’s motion for summary judgment seeking dismissal of the complaint is denied.

 It is not clear who first posted the videotape. Even if it were conclusively ascertained that it first appeared on thisissabrinassin.com, there is no conclusive evidence that the site is under Ross’s control. Further, there is an “add videos” button on that site which enables other people to upload videos, so it is unknown who actually uploaded the videotape to thisissabrinassin.com.