Present:  All the Justices

WJLA-TV, ET AL.

OPINION BY
v.  Record No. 012050    JUSTICE LAWRENCE L. KOONTZ, JR.
June 7, 2002
STEPHEN M. LEVIN, M.D.

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Jonathan C. Thacher, Judge

In this appeal, we consider various issues arising out of a

judgment in favor of the plaintiff in an action alleging common

law defamation and the unauthorized use of the plaintiff's image

for advertising purposes in violation of Code § 8.01-40(A).

Much of the evidence adduced at trial was in conflict.  However,

applying settled appellate principles, we review the evidence

and all reasonable inferences flowing therefrom in a light most

favorable to the plaintiff-appellee, who prevailed in the trial

court.  RF&P Railroad v. Metro. Wash. Airports Auth., 251 Va.

201, 208, 468 S.E.2d 90, 94 (1996).  Additionally, we will

recite the voluminous evidence in summary fashion, stating only

the facts and proceedings relevant to appellants' five

assignments of error, which we will address seriatim.[1]  Majorana

---

[1] The trial court record includes more than 3100 pages of
pleadings and court documents, thirteen volumes of trial
transcripts, several more volumes of deposition transcripts, and
hundreds of pages of exhibits.

v. Crown Central Petroleum Corp., 260 Va. 521, 523, 539 S.E.2d 426, 427 (2000).

BACKGROUND

In early 1997, Stephen M. Levin, M.D., an orthopedist whose professional office is located in Vienna, Virginia, was the subject of a hearing held by the Virginia Board of Medicine concerning complaints filed by a number of his female patients who asserted that certain treatment by him had been medically inappropriate. The specific medical condition involved was "piriformis syndrome," which may be defined generally as a condition in which the piriformis muscle in the buttock irritates the sciatic nerve causing pain in the buttock, lower back, and leg. Dr. Levin's treatment for piriformis syndrome involves intravaginal manipulation of the piriformis muscle.

The Board of Medicine dismissed those complaints. One of the complaining patients publicly criticized the Board's decision and brought her complaints to the attention of the media defendants in the present case. The media defendants' actions in investigating Dr. Levin's treatment for piriformis syndrome and in broadcasting reports concerning that investigation spawned the present litigation.

On May 28, 1999, Dr. Levin filed a motion for judgment in the Circuit Court of Fairfax County against WJLA-TV, Allbritton Communications Company, Allbritton Groups, Inc., Perpetual

2

Corporation, and against Candace Mays and Archie Kelly, two of WJLA-TV's newsroom employees, individually (collectively, WJLA). WJLA-TV broadcasts on Channel 7 in the Washington, D.C. metropolitan area, including Vienna, Virginia. Relevant to this appeal, Dr. Levin alleged in count one of his motion for judgment, and again in a second amended motion for judgment, that WJLA defamed Dr. Levin in a news story aired as part of WJLA-TV's 11:00 p.m. broadcast on November 18, 1997, and in advance advertisements and promotional announcements relating to that news story, by accusing him of sexually assaulting female patients and performing inappropriate medical procedures.

The broadcast of the news story, which identified Dr. Levin by name and used his image, recounted the allegations of several of Dr. Levin's female patients that they had been subjected to "inappropriate pelvic exams" during treatment by Dr. Levin for piriformis syndrome. The broadcast recounted that despite the testimony of other female patients with similar complaints about his treatment of them, the Board of Medicine had closed the case against Dr. Levin for insufficient evidence. The broadcast also recounted that one of Dr. Levin's patients had filed a $1 million law suit against him as a result of his treatment of her. The broadcast included the videotaped statements of Dr. Loren M. Fishman, who was described as having "literally [written] the book on piriformis syndrome," and who was reported

3

to have said that he had never heard of "vaginal manipulation" as a treatment for this syndrome.  Also included were assertions that leading experts from George Washington University Hospital and the Mayo Clinic in Rochester, Minnesota had said that they had never heard of treating piriformis syndrome by "vaginal manipulation."  Finally, the broadcast concluded with a statement that Dr. Levin "has denied doing anything wrong," but that he "declined an on camera interview."

In promotional announcements preceding the broadcast, WJLA referred to its "undercover" investigation "expos[ing] the intimate violation of women at the hands of their doctor," which amounted to "sexual assault," and repeatedly referred to the unnamed subject of the news story as "the 'Dirty Doc' " and "the X-Rated Doctor."  Two of the televised promotional announcements featured Dr. Levin's image, which Candace Mays had obtained without his permission by using a hidden videocamera while posing as a patient at his office.

Dr. Levin alleged that he had suffered unspecified "general and special damages" as a result of the defamatory statements. He further alleged that WJLA had been negligent in making the defamatory statements and that they had done so with actual malice, either knowing that the statements were false or in reckless disregard of the truth or falsity of the statements.

4

In count five of the motion for judgment, Dr. Levin alleged that the use of his image without his consent in two of the televised promotional announcements constituted a misappropriation of his likeness for advertising or trade purposes in violation of Code § 8.01-40(A).  Dr. Levin alleged that as a result of this misappropriation he had suffered humiliation, mental anguish, and damage to his status and reputation.

In a general ad damnum clause at the conclusion of the amended motion for judgment, Dr. Levin sought $30 million in compensatory damages.  He also sought $350,000 in punitive damages.

WJLA filed an answer generally denying the allegations of Dr. Levin's amended motion for judgment.  WJLA also raised various affirmative defenses, including assertions that the alleged defamatory statements were newsworthy and fair comment on a matter of public concern.  Additionally, WJLA asserted that their use of Dr. Levin's image was not in violation of Code § 8.01-40 because it was used to promote a newsworthy story and not for advertising.

A jury trial was held in the trial court and extended over a period of three weeks.  The respective positions of the parties that developed from the evidence during the trial, and

5

which they have continued to maintain in this appeal, can be summarized fairly as follows.

Dr. Levin presented evidence that he had practiced orthopedic medicine for more than thirty years. He established that diagnosing piriformis syndrome through intravaginal manipulation of the piriformis muscle is a recognized medical procedure. He also established that he was regarded by some as an expert in the field of the diagnosis and treatment of piriformis syndrome, having diagnosed and treated thousands of patients for this condition, having written articles and given lectures on his treatment modality of this syndrome, and having received referrals from other doctors for his treatment of this syndrome. Dr. Levin also presented evidence that his treatment modality is widely accepted in the medical community.

Dr. Levin presented evidence that the complaints to the Board of Medicine were made by a small number of his patients who were included among those interviewed by WJLA for the news story. He contended that the Board of Medicine had conducted a thorough investigation and had dismissed their complaints, fully exonerating him of any wrongdoing.

Dr. Levin further established that approximately five months after the Board of Medicine had concluded its investigation, Candace Mays, a television news producer, was contacted by Jean Jessup, one of the patients whose complaint

6

had been reviewed by the Board of Medicine. Based on this contact, and despite having been informed by the Board of Medicine that Dr. Levin had been exonerated of any wrongdoing, Mays and Archie Kelly, a television news reporter, ultimately determined to make Dr. Levin the subject of an undercover investigation to be broadcast during the television ratings "sweeps" period in November 1997.

At the conclusion of Dr. Levin's case-in-chief, WJLA moved to strike his evidence regarding counts one and five of the motion for judgment and filed briefs in support of those motions. The trial court denied both motions. WJLA also filed a motion and supporting brief to bar any claim by Dr. Levin for damages to his incorporated medical practice. The arguments made on these motions form the basis for much of the argument of the issues raised in this appeal and, accordingly, we will address them in more detail within our subsequent discussion of the individual assignments of error.

WJLA presented, among other things, testimony from nine of Dr. Levin's patients and a medical expert. Each patient testified to her subjective belief that Dr. Levin's treatment had been abusive and humiliating. Some of the patients also testified that Dr. Levin had fondled their breasts on what they considered to be a pretext of performing exams for breast cancer.

7

Dr. William C. Lauermann, an orthopedic surgeon, testified on behalf of WJLA that piriformis syndrome is a controversial diagnosis.  Dr. Lauermann further testified that in his opinion intravaginal manipulation of the piriformis muscle would not be a proper treatment modality for piriformis syndrome, which is generally treated with rest, physical therapy, and anti-inflammatory drugs.  Dr. Lauermann also testified that performing breast exams was "completely out of the realm of orthopedics."

The jury returned its verdict in favor of Dr. Levin on counts one and five of the motion for judgment, awarding him $2 million damages for defamation and $575,000 for the unauthorized use of his image.[2]  WJLA filed a post-verdict "motions to strike Count Five . . . and for a new trial on Count One and Count Five."  In a final judgment order dated June 22, 2001, the trial court denied the post-verdict motions and entered judgment for Dr. Levin on the jury's verdict.  In an order dated December 20, 2001, we awarded WJLA this appeal.

---

[2] Prior to submitting the case to the jury, Dr. Levin withdrew his claim for punitive damages and no punitive damages were awarded to him.

DISCUSSION

Assignments of Error

WJLA assigns five errors to the judgment of the trial court:

1.  The Trial Court erred by declining to hold that each of the six separate publications at issue are not actionable as a matter of law.

2.  The Trial Court erred by submitting to the jury a verdict form that permitted it to base its verdict on six separately allegedly defamatory publications collectively.

3.  The Trial Court erred by failing to strike Count 5 or to set aside the verdict because the record does not support a cause of action for violation of Va. Code § 8.01-40(A).

4.  The Trial Court erred by failing to set aside or reduce the jury's $2,000,000 defamation award of undifferentiated actual and presumed damages.

5.  The Trial Court erred by declining to instruct the jury that it could not award damages based on the decline in value of Dr. Levin's incorporated medical practice.

Whether the Publications were Defamatory

In count one of his motion for judgment, Dr. Levin cited collectively the following statements made or published by WJLA as having defamed him:

An advertisement in the Washington, D.C. metropolitan area television supplement of the Washington Post that read:

Q: When does a physical examination become a sexual assault?  A: When you go to the 'Dirty Doc'.

9

FIND OUT WHAT THIS 'DOCTOR' HAS DONE AND YOU'LL BE APPALLED.  FIND OUT HOW MANY WOMEN HE HAS DONE IT TO AND YOU'LL BE ASTONISHED.  THE DETAILS ON THE 'DIRTY DOC' IN A NEWS 7 SPECIAL REPORT

TONIGHT 11:00

An advertisement played on various radio stations in the Washington, D.C. metropolitan area that stated:

A story so outrageous it almost defies description. There is a local doctor here who has a very, very peculiar method for treating his patients.  He calls it a cure.  The women who have received his treatment call it sexual assault.  What exactly does he do? When you find out, you'll be outraged.  When you find out how many women he has done it to, you'll be amazed.  Reminder: The X-rated doctor, tonight on News 7 at 11:00.

A promotional segment on WJLA featuring Dr. Levin's image with an audio announcement that stated:

"When does a doctor's treatment become a sexual assault?  The story Tuesday at eleven."

Another similar segment featuring Dr. Levin's image with an audio announcement that stated:

"News 7 goes under cover to expose the intimate violation of women at the hands of their doctor. Don't miss this special report Tuesday on News 7 at eleven."

Dr. Levin also asserted that various statements made during the broadcast of the news story on November 18, 1997, were defamatory.  Those statements included references to "vaginal manipulation," "highly unusual pelvic examinations," and "inappropriate pelvic exams."  Dr. Levin asserted that these

10

terms were intended to convey that his treatment modality for piriformis syndrome was not a medically recognized procedure and were intended to convey that he had sexually assaulted his patients.

Dr. Levin also asserted that he was defamed by statements made to Dr. Fishman by Mays and Kelly that they were investigating an unnamed doctor who was "sexually approaching his female patients," "digitally stimulating [his patients] in the vagina and causing pain to them," and similar statements. It was subsequently established at trial that Dr. Levin contacted Dr. Fishman, after Dr. Fishman had spoken with Mays and Kelly, and provided him with details of his professional background and the procedure he performed on his patients with piriformis syndrome. After receiving this information, Dr. Fishman contacted WJLA and retracted statements that he had made during the taped interview that he considered the unnamed doctor's actions to be inappropriate. Nonetheless, WJLA cited Dr. Fishman in its news story as confirming that the procedure was not medically appropriate.

"Whether statements complained of in a defamation action fall within the type of speech which will support a state defamation action is a matter for the trial judge to determine as a matter of law" before the matter may be properly submitted

11

to the jury.  Yeagle v. Collegiate Times, 255 Va. 293, 296, 497

S.E.2d 136, 138 (1998).

> [A defamation] plaintiff must show that the alleged
> [defamation] was published "of or concerning" him.  He
> need not show that he was mentioned by name in the
> publication.  Instead, the plaintiff satisfies the 'of
> or concerning' test if he shows that the publication
> was intended to refer to him and would be so
> understood by persons reading [or hearing] it who knew
> him . . . .  But if the publication on its face does
> not show that it applies to the plaintiff, the
> publication is not actionable, unless the allegations
> and supporting contemporaneous facts connect the
> [defamatory] words to the plaintiff.

The Gazette, Inc. v. Harris, 229 Va. 1, 37, 325 S.E.2d 713, 738

(1985) (internal citations omitted).

WJLA asserts in its first assignment of error that none of

the publications in question are actionable in defamation as a

matter of law and, accordingly, that the trial court erred by

failing to strike count one of Dr. Levin's motion for judgment

at the conclusion of his case-in-chief.  Our consideration of

this issue, however, is limited by the procedural posture in

which it necessarily comes to us in this particular case.  At

trial, without objection by WJLA, the trial court granted Dr.

Levin's requested instruction 27 which told the jury that it

could return a verdict for Dr. Levin if he proved by the greater

weight of the evidence that WJLA made "any one" of the

statements in question.  Accordingly, WJLA has waived the issue

whether all the publications are actionable and has limited our

12

independent review of the record regarding this assignment of error to whether any one publication was actionable as a matter of law.

As we have noted above, in the trial court the various alleged defamatory publications were collectively asserted and presented as one count of defamation. While it is true, as WJLA points out, that each publication of a defamatory statement is a separate tort and, indeed, generally subsequent republications of such a statement are separate torts, Weaver v. Beneficial Finance Co., 199 Va. 196, 199, 98 S.E.2d 687, 690 (1957), a plaintiff is not required to bring a defamation action in that fashion. Of course, a plaintiff is not entitled to recover damages for publications that are not actionable as a matter of law or that are not proven to be "of or concerning" him. However, we are of opinion that statements or publications by the same defendant regarding one specific subject or event and made over a relatively short period of time, some of which clearly identify the plaintiff and others which do not, may be considered together for the purpose of establishing that the plaintiff was the person "of or concerning" whom the alleged defamatory statements were made. This is so even where the publication identifying the plaintiff is made subsequent to those that do not identify him. See M.C. Dransfield, Annotation, What evidence is admissible to identify plaintiff as

13

person defamed, 95 A.L.R.2d 227 § 4 (1964); see also Gelencser v. Orange County Publications, 498 N.Y.S.2d 13, 14 (N.Y. App. Div. 1986) (no error to permit plaintiff to include allegations that references from which he could be identified that appeared in subsequent news story concerning allegations of child abuse provided the context whereby he could be identified as the subject of two prior articles which used fictitious names).

This principle is manifestly applicable to the undisputed facts of the present case. The thrust of Dr. Levin's claim of defamation was that WJLA's publications collectively accused him of sexually assaulting some of his female patients under the guise of treating them for piriformis syndrome. It is undisputed that all of WJLA's publications concerned Dr. Levin's treatment modality and were made within a relatively short period of time. WJLA concedes that its televised promotional publications, which included Dr. Levin's images, were "of or concerning" Dr. Levin. That being the case, it cannot be said that the other publications, including the statements to Dr. Fishman, considered collectively were not as a matter of law "of or concerning" Dr. Levin.

In The Gazette, we held, as a matter of state law, that

[I]n an action brought by a private individual to recover actual, compensatory damages for a defamatory publication, the plaintiff may recover upon proof by a preponderance of the evidence that the publication was false, and that the defendant either knew it to be

14

false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based . . . . In addition, . . . such liability may be based upon negligence, whether or not the publication in question relates to a matter of public or general concern.

229 Va. at 15, 325 S.E.2d at 724-25.

We went on to say that "this negligence standard is expressly limited, however, to circumstances where the defamatory statement makes substantial danger to reputation apparent." Id., 325 S.E.2d at 725. Whether a defamatory statement "makes substantial danger to reputation apparent" is a question of law to be resolved by the trial court. Id.

As to each of the alleged defamatory publications, it is self-evident that when these statements are understood to apply to Dr. Levin, it is manifestly apparent that they posed a substantial danger to his reputation as a physician. Moreover, in its brief in support of the motion to strike count one of the motion for judgment at the conclusion of Dr. Levin's case-in-chief, WJLA conceded that "[l]ooked at most favorably to [Dr. Levin] . . . there may be negligence."[3] For these reasons, the

_____

[3] During the trial, WJLA at times contended that Dr. Levin was a public figure and, thus, could prevail only upon a showing of actual malice. WJLA has not expressly raised this contention on appeal. Moreover, it is apparent on the record that Dr. Levin "did not occupy a position of 'such persuasive power and influence' [in society] that he could be deemed a public figure" for all purposes, Fleming v. Moore, 221 Va. 884, 891-92, 275

15

trial court did not err in concluding that there was sufficient evidence to submit to the jury the issue whether WJLA was negligent in making any of the six publications and, if so, for a determination of the actual damages Dr. Levin suffered as a result.

WJLA asserts, however, that because Dr. Levin sought presumed as well as actual damages, the trial court was required to make the further determination whether there was evidence of actual malice before submitting the case to the jury. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 349 (1974); Shenandoah Publishing House v. Gunter, 245 Va. 320, 324, 427 S.E.2d 370, 372 (1993). WJLA contends that there was insufficient evidence of actual malice and, thus, the trial court erred in submitting each of the six instances of publication to the jury with instructions that presumed damages could be awarded.

In the context of a claim of defamation, "actual malice," often called New York Times malice in reference to the United Stated Supreme Court's decision in New York Times v. Sullivan, 376 U.S. 254 (1964), requires that "the plaintiff show[] that

_____

S.E.2d 632, 637 (1981), nor would the fact that he was a subject of complaints to the Board of Medicine place him so significantly in the public eye as to make him a "public figure" except for the limited purpose of reporting on the specifics of the Board's public proceedings. Accordingly, in this case Dr. Levin is to be considered a private individual for purposes of his claims against WJLA.

16

the defendant knew the publication to be false or evidenced reckless disregard for the truth." Great Coastal Express, Inc. v. Ellington, 230 Va. 142, 149, 334 S.E.2d 846, 851 (1985). We agree with WJLA that where a private individual alleges defamation by a news-media defendant involving a matter of public concern, presumed damages cannot be awarded in the absence of actual malice. Id.

In instructing the jury, the trial court directed that the jury should answer the following special interrogatory after reaching its verdict on the claim for defamation:

> If you found for Dr. Levin on the Defamation count against [WJLA], do you further find by clear and convincing evidence that [WJLA] knew the defamatory statements were false or made them so recklessly as to amount to a willful disregard for the truth, that is with a high degree of awareness that the statements probably were false?

The jury responded in the affirmative. Thus, although we conduct an "independent examination of the whole record" to determine whether the evidence was sufficient to support a finding of actual malice, The Gazette, 229 Va. at 19, 325 S.E.2d at 727, we view the record in a light favorable to Dr. Levin, including the jury's finding as demonstrated by its response to the special interrogatory, and we will affirm the trial court's decision to submit that issue to the jury, unless it is plainly wrong or without support in the record. See id.; Code § 8.01-680.

17

We need not recount all the evidence that would support the trial court's decision to submit the question of actual malice to the jury and the jury's affirmative finding.  Rather, we simply note that the jury could have based its finding of actual malice, for example, on WJLA's use of Dr. Fishman's statement that Dr. Levin's treatment modality for piriformis syndrome was improper despite its knowledge that Dr. Fishman had retracted that statement.  The jury could also have found that in its promotional publications WJLA, directly or by implication, accused Dr. Levin of committing criminal sexual assaults while knowing that no criminal charges had been brought against him and having reason to know, based on the results of the Board of Medicine's investigation, that such charges probably could not be sustained.

In short, the question whether WJLA acted with actual malice was sufficiently at issue to warrant having the jury decide the matter.  The jury having found by special interrogatory that WJLA acted with actual malice, Dr. Levin was entitled to receive presumed as well as actual damages.  Accordingly, we hold that the trial court did not err in submitting the issues of actual malice and presumed damages to the jury.

Finally, WJLA asserts that the November 18, 1997 news story was not defamatory as a matter of law because the statements

18

made therein were either not proven to be false or were statements of opinion not actionable as defamation. WJLA contends that when the broadcast is viewed as a whole, it "does not accuse Levin of anything; rather, it raises legitimate questions about his conduct arising from charges made against him by his former patients." We disagree.

Speech that does not contain a provably false factual connotation is sometimes referred to as "pure expressions of opinion," and cannot normally form the basis of an action for defamation. See, e.g., Williams v. Garraghty, 249 Va. 224, 233, 455 S.E.2d 209, 215 (1995); Chaves v. Johnson, 230 Va. 112, 119, 335 S.E.2d 97, 101 (1985). However, the United States Supreme Court has specifically declined to hold that statements of opinion are categorically excluded as the basis for a common law defamation cause of action. Milkovich v. Lorain Journal Co., 497 U.S. 1, 18-21 (1990). Moreover, factual statements made to support or justify an opinion can form the basis of an action for defamation. Williams, 249 Va. at 233, 455 S.E.2d at 215; see also Swengler v. ITT Corp., 993 F.2d 1063, 1071 (4th Cir. 1993). Whether an alleged defamatory statement is one of fact or of opinion is a question of law to be resolved by the trial court. Chaves, 230 Va. at 119, 335 S.E.2d at 102.

As we have already noted in discussing whether the evidence was sufficient to support the jury's finding of actual malice,

19

statements made during the broadcast accused Dr. Levin of having committed criminal sexual assault. Moreover, WJLA did not object to Dr. Levin's jury instruction 34 providing, inter alia, that the statements attributed to WJLA were "understood to mean that Dr. Levin has committed the crime of sexually assaulting his patients and that Dr. Levin had intimately violated his patients." The news story also stated that Dr. Levin's treatment modality for piriformis syndrome was not medically appropriate, and WJLA used statements by Dr. Fishman to support that assertion while knowing that Dr. Fishman had retracted those statements.

In this context, the statements made by Dr. Levin's former patients were arguably expressions of their own subjective opinions about the treatment they had received. However, WJLA reported the allegations contained in these statements as fact. Indeed, it did so after having told its viewers to watch this broadcast to find out what the "Dirty Doc" had done to his patients and that his treatments were sexual assaults on his patients. WJLA simply ignored or minimized competent data and opinions that contradicted the image of Dr. Levin that it conveyed to its viewing audience. Therefore, this particular news story contained factual statements, which were verifiably false and can form the basis of a defamation action. Thus, we hold that the trial court did not err in rejecting WJLA's

20

argument that the statements made in the news story were constitutionally protected opinion.

For these reasons, we hold that the trial court did not err in failing to strike the evidence on count one of the motion for judgment.

<u>The Verdict Form</u>

Over WJLA's objection, the case was submitted to the jury with a verdict form that did not require the jury to make a specific finding that each of the six publications was defamatory.  Rather, the verdict form permitted the jury to make a single general finding for Dr. Levin "on the Defamation count against [WJLA] and assess compensatory damages in the amount of $ _____."  WJLA contends that this was error because the jury could have awarded damages for publications that it did not find to be defamatory.

Under different circumstances, we well might agree with WJLA's position on this issue.  This case, however, does not involve separate and distinct defamation claims based on separate and distinct publications or statements.  As we have explained above, the case was filed and tried on one count of defamation based collectively on publications and statements by the same defendant, its agents, and its employees and all regarding Dr. Levin's treatment modality of piriformis syndrome. Additionally, WJLA agreed to instructions 26 and 27 which

permitted the jury to return a verdict for Dr. Levin if "any" of the publications were made by WJLA and were defamatory. Because the case was submitted to the jury in that fashion and our independent review of the record does not reveal that the use of a special verdict form would have altered the jury's award of damages or the amount of those damages, we are of opinion that the use of the general verdict form was not reversible error in this particular case.[4]

Failure to Strike or Set Aside Verdict on Count Five

WJLA contends that the trial court erred in failing to strike count five of the motion for judgment because Code § 8.01-40 is not applicable to promotional announcements for news reports on matters of public concern. Dr. Levin responds that WJLA has waived this issue because it submitted an instruction which stated that this "newsworthiness exception" would not apply to a use which was "willful, wanton, and reckless." We disagree with Dr. Levin.

Initially, we reject Dr. Levin's assertion of a waiver on this issue. WJLA's motion to strike count five, asserted at the

---

[4] We also reject WJLA's contention that because each publication could be considered a separate tort, the trial court was required to use a special verdict form. WJLA again relies on Weaver, supra, to support this proposition, and, as we have already explained, Weaver is inapposite in this case because of the fashion in which the present case was submitted to the jury.

22

close of Dr. Levin's case-in-chief and reasserted at the close of all the evidence, was premised, in part, on the contention that there should be a "newsworthiness exception" to Code § 8.01-40. Responding to the motion to strike, Dr. Levin contended that such an exception would not apply in this case because the "promotional and so-called 'news' broadcasts were infected with substantial and material falsification." The trial court apparently concurred in this contention and denied WJLA's motion to strike count five.

Both parties proffered instructions on the application of Code § 8.01-40. Dr. Levin's proposed instruction did not address the "newsworthiness exception" and his proposed limitation, but merely stated the elements of misappropriation as defined by the statute. WJLA objected to this instruction, and, while continuing to contest the applicability of Code § 8.01-40 to the facts of this case, proffered an alternative instruction consistent with the position Dr. Levin had asserted in arguing against the motion to strike.

Upon WJLA's objection, the trial court initially took Dr. Levin's proposed instruction under advisement. When WJLA's competing instruction was proffered, Dr. Levin at first objected, then agreed to its being given, but further stated that the trial court should also give his instruction. The trial court indicated that both instructions would be given.

23

Dr. Levin's counsel then inquired whether the trial court had "rule[d] on the motion to strike" count five. The trial court indicated that the motion to strike had been denied. WJLA then objected to the granting of Dr. Levin's instruction because it did not include the "newsworthiness exception," which had been the basis of Dr. Levin's argument against the motion to strike count five. Despite having concurred in WJLA's instruction, Dr. Levin insisted that the "[newsworthiness exception] is not the law." WJLA indicated to the trial court that its instruction included the elements of the statute given in Dr. Levin's instruction. The trial court agreed and reversed its decision to give Dr. Levin's instruction.

Normally, when a party proffers or agrees to an instruction which is contrary to a position previously argued during trial, the agreed instruction becomes the law of the case, and the party is deemed to have waived its previous objection. See, e.g., T.L. Garden & Associates v. First Savings Bank of Virginia, 262 Va. 28, 31, 546 S.E.2d 705, 706 (2001). However, when the record is clear that the party is not waiving its objection to the prior ruling, but merely proffering or agreeing to an instruction consistent with the trial court's prior ruling, the previous objection will not be waived. See, e.g., Wright v. Norfolk & Western Ry. Co., 245 Va. 160, 169-70, 427 S.E.2d 724, 729 (1993); see also Code § 8.01-384.

24

In the present case, Dr. Levin's proffered instruction, to which WJLA objected, did not comport with his prior argument or the ruling of the trial court.  By contrast, WJLA's instruction merely stated the law that the trial court had adopted in overruling WJLA's motion to strike.  Moreover, it is clear from the post-verdict record that WJLA continued to assert in its motion to set aside the jury's verdict that Code § 8.01-40 was not applicable on the facts of this case.  Accordingly, we hold that WJLA did not waive its objection to the trial court's ruling denying the motion to strike count five.  The record establishes that WJLA was not inviting error by proffering the instruction, but was merely seeking to have the trial court's position on the law, to which WJLA had previously objected, clearly stated to the jury.  Wright, 245 Va. at 170, 427 S.E.2d at 129.

We now turn to the question whether the nonconsensual use of a person's name or image by the news media to promote a news story about that person is a tortious unauthorized use under Code § 8.01-40.  Code § 8.01-40 is a statutory codification of one of the four common law torts of invasion of privacy.[5]  We

---

[5] The common law torts of invasion of privacy are (1) unreasonable intrusion upon the plaintiff's seclusion, or solitude, or into his private affairs; (2) public disclosure of true, embarrassing private facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the

25

discussed the application of Code § 8.01-40 in some detail in

Town & Country Properties, Inc. v. Riggins.  There we stated

that:

> Code § 8.01-40(A) provides that if a person's
> "name, portrait, or picture" is used for "advertising
> purposes or for the purposes of trade" without written
> consent, the person may maintain a suit in equity to
> prevent the use, and may sue and recover damages for
> any injuries resulting from such use.
>
> . . . .
>
> Use for "advertising purposes" and use "for the
> purposes of trade" are separate and distinct statutory
> concepts.  Claims based, as here, on the use of a name
> "for advertising purposes" have received a more
> liberal treatment by the courts than those based on
> use "for purposes of trade."  The unauthorized use of
> a person's name as an integral part of advertising
> matter "has almost uniformly been held actionable."
> And, a name is used "for advertising purposes" when
> "it appears in a publication which, taken in its
> entirety, was distributed for use in, or as part of,
> an advertisement or solicitation for patronage of a
> particular product or service."

---

public eye; and (4) misappropriation of plaintiff's name or
likeness for commercial purposes.  William L. Prosser, The Law
of Torts § 117 (4th ed. 1971).  By codifying only the last of
these torts, the General Assembly has implicitly excluded the
remaining three as actionable torts in Virginia.  See Falwell v.
Penthouse, 521 F. Supp. 1204, 1206 (W.D. Va. 1981).
Accordingly, we agree with WJLA and the amici curiae that, to
the extent that count five asserts a claim for false light
publicity, it fails to state a proper cause of action.  Rather,
in Virginia where, as here, a plaintiff alleges that the
defendant made an unauthorized use of the plaintiff's name or
image in a context that is false and would be highly offensive
to a reasonable person, his remedy is to prove that the context
was defamatory, and not that the use was a misappropriation.
Cf. Rodney A. Smolla, 2 Law of Defamation, § 10:10 (2d ed.
2000) (contrasting the elements of privacy torts and
defamation).

26

249 Va. 387, 394-95, 457 S.E.2d 356, 362 (1995) (citations omitted).

We recognized in Town & Country Properties that Virginia is among the few states, including New York, that have limited the application of the common law privacy torts by statute. We further recognized that under certain circumstances we may "look to New York courts for guidance" by considering the construction given by that state's courts to the similar statutory right of privacy enacted by its legislature. Id. at 394, 457 S.E.2d at 362.

In Messenger v. Gruner+Jahr Printing and Publishing, 727 N.E.2d 549 (N.Y. 2000), the New York Court of Appeals reiterated its long-standing position that the right of privacy does not extend "to reports of newsworthy events or matters of public interest." Id. at 552. So long as there is a "real relationship between" the use of a person's name or image and the report, and the report is not merely "an advertisement in disguise," there is no misappropriation. Id. at 554. Applying this principle to the facts in Messenger, the New York Court of Appeals concluded that this was so even where a "false implication . . . might be reasonably drawn" from the use of the plaintiff's name or image. Id.

Dr. Levin asserts that the promotional announcements were intended, in part, to entice the public to view the WJLA news broadcast in order to increase the station's ratings during a critical "sweeps" period and, thus, potentially increase future advertising revenue. While this may be so, it cannot reasonably be disputed that the principal purpose of WJLA's announcements was to promote a report "of [a] newsworthy event[] or matter[] of public interest." It is a newsworthy event and a matter of public interest when a physician is accused by his patients of sexually assaulting them. Accordingly, we hold that the use of Dr. Levin's image in WJLA's promotional announcements was not an unauthorized use prohibited under Code § 8.01-40, and the trial court erred in failing to strike count five. For these reasons, we will reverse the judgment in favor of Dr. Levin and the award of $575,000 on count five and enter final judgment on that count for WJLA.[6]

### Failure to Set Aside or Reduce Damages for Defamation

We have already determined that the evidence was sufficient to support an award in favor of Dr. Levin for both actual and presumed damages resulting from WJLA's defamatory statements.

---

[6] Because we conclude that count five was improperly submitted to the jury, we do not address WJLA's further contention that the damages awarded for count five were duplicative of the damages awarded for defamation.

WJLA nonetheless contends that the amount of those damages was excessive, and that the trial court erred in failing to set aside or reduce that award.  The substance of WJLA's argument on appeal is that the award of $2 million, which it contends is ten times larger than any prior award in a defamation action sustained by this Court, bears no reasonable relationship to the actual loss suffered by Dr. Levin.  Thus, it further contends that the trial court should have set aside the verdict and awarded WJLA a new trial or ordered a substantial remittitur.[7] Dr. Levin responds that he presented evidence of actual damages in excess of $900,000 and that the balance of the verdict represents adequate compensation for the injury to his reputation and the humiliation and mental anguish he suffered as a result of WJLA's defamatory conduct.[8]

---

[7] In its post-trial brief, WJLA contended that an award of $50,000 would be appropriate.

[8] Some courts have noted that it is the injury to reputation which is the essence of a claim for defamation, citing not legal precedent, but Shakespeare's Iago:

> Good name in man and woman, dear my lord,
> Is the immediate jewel of their souls.
> Who steals my purse steals trash;
> 'Tis something, nothing;
> 'Twas mine, 'tis his, and has been slave to thousands;
> he that filches from me my good name
> Robs me of that which not enriches him,
> And makes me poor indeed.

Othello, Act III, scene iii.

29

With respect to claims of defamation, we have said that "[t]o ascertain what is a fair and reasonable compensation for such an injury, inflicted under the circumstances, is not easy. It has been repeatedly stated that there is no rule of law fixing the measure of damages, nor can it be reached by any process of computation." News Leader Co. v. Kocen, 173 Va. 95, 103, 3 S.E.2d 385, 388-89 (1939); see also The Gazette, 229 Va. at 41, 325 S.E.2d at 740. This being so, we must take special heed of the principle, applicable to any claim that a jury award is excessive, " 'that the verdict of the jury will not be set aside unless it is so grossly excessive (or inadequate) as to indicate that the jury in rendering it were actuated by prejudice, passion or corruption, or that they have been misled by some mistaken view of the merits of the case.' " News Leader Co., 173 Va. at 103, 3 S.E.2d at 389 (quoting Kroger Grocery Co. v. Rosenbaum, 171 Va. 158, 164, 198 S.E. 461, 463 (1938)).

Moreover, in such cases we accord the trial court a large measure of discretion regarding whether a verdict should be affirmed, set aside, or reduced "because it saw and heard the witnesses while we are confined to the printed record." Richmond Newspapers, Inc. v. Lipscomb, 234 Va. 277, 300, 362 S.E.2d 32, 45 (1987). "Unless the amount of the award is so

See, e.g., Milkovich, 497 U.S. at 12.

30

excessive as to shock the conscience of the court . . . a verdict approved by the trial court will not be disturbed on appeal." The Gazette, 229 Va. at 41, 325 S.E.2d at 740.

We find no abuse of the trial court's discretion in its refusal to set aside or remit a portion of the damages awarded for defamation in this case. Dr. Levin's evidence of actual damages, though criticized by WJLA in argument to the jury, was not rebutted. Given that we have found the evidence supports the jury's finding of actual malice, we cannot say that its award was the result of prejudice, passion, or some mistaken view of the merits of the case. To the contrary, given the grave nature of the unfounded allegations made against Dr. Levin and the inevitable damage caused to his professional reputation, the jury's award was not excessive. Accordingly, we hold that the trial court did not err in upholding the award of $2 million for count one.

### Failure to Instruct Jury to Disregard Damages Sustained by Dr. Levin's Incorporated Medical Practice

WJLA contends that the trial court erred in failing to grant a portion of its instruction H directing the jury that it could not award damages based upon a diminution in the value of Dr. Levin's incorporated medical practice. Dr. Levin contends that WJLA waived its objection to the trial court's failing to

grant instruction H because WJLA agreed to his instruction 30, which permitted the jury to award damages for "any loss or injury to [Dr. Levin] in his medical practice." Although the argument in the record concerning these two instructions is quite confused, we will assume that instruction H was intended to direct the jury not to award damages for losses specific to the incorporated medical practice as a business that were separate and apart from the damages suffered by Dr. Levin in regard to his personal capacity to maintain a medical practice generally.

WJLA relies upon Landmark Communications, Inc. v. Macione, 230 Va. 137, 140, 334 S.E.2d 587, 589 (1985), for the principle that a defamation plaintiff cannot recover for losses sustained by a corporation he controls. This is so because the corporation is a separate legal entity capable of seeking redress for the defamation in its own right. Id.; see also Keepe v. Shell Oil Co., 220 Va. 587, 591, 260 S.E.2d 722, 724 (1979).

WJLA's reliance on Landmark Communications is misplaced. In that case, the defamation plaintiff "showed no damages to himself, as opposed to those his corporation may have suffered" and did not seek presumed damages. 230 Va. at 140, 334 S.E.2d at 588-89. Accordingly, in the absence of evidence that he

personally suffered actual damages as a result of the defamation, the plaintiff was entitled to recover nothing.

By contrast, in this case Dr. Levin presented ample evidence of the personal damages he suffered as a result of WJLA's defamatory publications. That evidence included expert testimony of the actual and potential future loss to Dr. Levin's ability to earn a living in the practice of medicine. Even if Dr. Levin chose to abandon his incorporated medical practice and seek employment elsewhere, the damage to his reputation caused by WJLA's defamation would continue to impair his ability to earn a living through the practice of medicine. Thus, that evidence did not relate to an injury that was exclusive to the incorporated medical practice.

In the second amended motion for judgment, Dr. Levin neither alleged nor claimed damages specific to his incorporated medical practice. The evidence presented with respect to that medical practice related to losses personal to Dr. Levin, and the jury was properly instructed that it could award damages for those personal losses. The instruction requested by WJLA to have the jury disregard damages specific to the incorporated medical practice would have served only to confuse the jury. Accordingly, we hold that the trial court did not err in refusing to grant that instruction.

33

CONCLUSION

For these reasons, we will affirm the judgment of the trial court in favor of Dr. Levin on count one, reverse the judgment in favor of Dr. Levin on count five, and enter final judgment.

<u>Affirmed in part,</u>
<u>reversed in part,</u>
<u>and final judgment.</u>