COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys,[*] Beales and Lorish
Argued by videoconference

UNPUBLISHED

TONYA D. CHAPMAN

                                              MEMORANDUM OPINION[**] BY
v.       Record No. 1105-22-2                  JUDGE LISA M. LORISH
                                                 JANUARY 16, 2024

JONATHAN BURKETT, ET AL.


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Jacqueline S. McClenney, Judge

Christian L. Connell (Christian L. Connell, P.C., on briefs), for
appellant.

Brett A. Spain (Bethany J. Fogerty; Willcox & Savage, P.C., on
brief), for appellees.


Tonya Chapman was appointed as Chair of the Virginia Parole Board soon after the

Board granted parole to Vincent L. Martin.  The decision to parole Martin was publicly

criticized.  In response to this criticism, the Office of the State Inspector General (OSIG)

investigated the grant of parole and the Board's actions before and after that decision.  A six-

page final report on the results of the OSIG investigation did not include any finding that

Chapman had violated any parole board policy or criminal law.

Jonathan Burkett, a reporter for WTVR-TV (owned by Scripps Media, Inc.), then

obtained a copy of a longer draft report and published stories and commented publicly about the

differences between the draft and final versions of the reports.  Burkett reported that this

---

[*] Judge Humphreys participated in the hearing and decision of this case prior to the
effective date of his retirement on December 31, 2023.

[**] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

"original" report contained OSIG findings that the Board, including Chapman, had indeed violated both policy and the law. Burkett strongly implied that the "original" report was changed for political reasons. Chapman sued Burkett for defamation, arguing that Burkett knew or should have known that the information in the draft report was omitted from the final report because those initial conclusions were false and unfounded. We agree with the trial court that Chapman failed to plead actual malice and affirm the decision to sustain Burkett's demurrer.

BACKGROUND[1]

The Board granted Martin parole in April 2020 after he served roughly 40 years in prison for killing a City of Richmond police officer. This decision happened shortly before Chapman was appointed Chair of the Board by Virginia Governor Ralph S. Northam.

Many criticized the Board's decision to grant Martin parole, including several Virginia legislators. As a result, OSIG investigated the Board's handling of the Martin matter. In July 2020, OSIG released a six-page confidential report ("final report") of its investigation to Brian Moran, Virginia's Secretary of Public Safety and Homeland Security. The next month, the final report was shared with senior state legislators. At the beginning and end of the final report, a notice warned its recipients not to "further disseminate this report to preserve the integrity of the investigation." Despite this warning, the final report was leaked to the media.

At some point before the release of the final report to Moran, OSIG had created a longer, 13-page draft report. According to Chapman, that "13-page Draft Report had been submitted to

---

[1] We state the facts here as they were alleged in Chapman's second amended complaint. *Patterson v. City of Danville*, 301 Va. 181, 197 (2022) ("When reviewing a circuit court order dismissing a claim on demurrer, we accept as true all factual allegations in the complaint 'made with sufficient definiteness to enable the court to find the existence of a legal basis for its judgment.'" (quoting *Squire v. Virginia Hous. Dev. Auth.*, 287 Va. 507, 514 (2014))). The second amended complaint did not incorporate by reference allegations in Chapman's prior complaints, so we do not consider them here. *See Lewis v. Kei*, 281 Va. 715, 719 (2011).

someone outside of OSIG for review and had been reduced to six pages as a result of that review." This draft report, unlike the final report, was not signed by the Virginia State Inspector General.[2]

Burkett, a reporter for WTVR-TV,[3] obtained a copy of the draft report in February 2021. As detailed below, over several days, Burkett published two news stories and made additional comments in a radio interview and at a press conference where he stated that the "original" OSIG report found that Chapman had committed a criminal offense by falsifying Board records. Burkett consistently referred to the 13-page draft as either the "original 13-page report," the "state inspector general's original 13-page report," or the "more extensive and detailed version of the report." Burkett repeatedly suggested that the report had been changed for political reasons and to help Governor Northam avoid embarrassment and publicity.

As a result of these statements, Chapman sued Burkett for defamation. She identified specific statements, reviewed below, as defamatory. In addition, Chapman pleaded that Burkett "knew that the 13-page document was a draft or preliminary report" and that it "differed substantially from the final OSIG report." Chapman argues that this knowledge means Burkett made these statements with actual malice. Chapman also pleaded that Burkett did not "discuss or attempt to verify any of the allegations contained in the Draft Report with anyone from OSIG" and that Burkett knew "Chapman had never been charged with or indicted for a crime of any sort."

---

[2] We adopt Chapman's description of the earlier report as a "draft report" throughout the opinion. When describing Burkett's reporting about this version, we use the phrase "original report," consistent with his reporting and Chapman's pleadings referencing the same.

[3] As pleaded, WTVR-TV is a television station owned and operated by Scripps Media, Inc.

The first defamatory statements Chapman identified in her complaint were from a February 23, 2021 story titled, "Report details violations made granting parole to a man who killed a Richmond Police Officer." This piece reported that Burkett obtained the "original thirteen-page report." Burkett received the report from a retired Air Force judge advocate, and reported that, in the opinion of his source, "it definitely looks like information was withheld to avoid embarrassment or other undesirable publicity." The story also reported that the original report was "loaded with details about violations of parole board policy and the law" and that OSIG had determined that Chapman had "violated multiple state codes and policies and violated the [C]onstitution of Virginia." The story noted differences between the two reports, including the content, length, and redactions. A video accompanying the article showed an image of text from the draft report which stated Chapman had committed a crime by falsifying reports in violation of Code § 18.2-472. At the bottom of the video, the caption stated "[p]arts of report written by inspector general removed or altered before released."

The next day, at a press conference held by Governor Northam about the COVID-19 virus, Burkett asked Secretary Moran,

> You're telling me the 6-page report we got last summer is what you saw. You didn't see the 13-page report that omitted things like the OSIG recommending a criminal misdemeanor charge against the current state parole board chair for falsifying documents.

On the same day, Burkett did an interview with WRVA radio where he said "[a] little birdy chirped in my ear that said keep digging and said there's more pages" and that the original report had been distributed to someone within the Governor's administration who reviewed it and directed that it be reduced to six pages. Burkett again repeated that in the original report the Inspector General "suggested" and made "determinations" about criminal charges for Chapman.

Chapman identifies the statements from both the press conference and WRVA interview as defamatory.

The same day, Sarah Rankin, a reporter for the Associated Press, also received the draft report. Rankin wrote a story stating that the 13-page report appeared to be a draft, although the "reasons for the substantial differences in content were not immediately clear."

One day later, on February 25, 2021, Burkett published a second story. Burkett reported that WTVR-TV had requested an interview with the Inspector General and had sent his office questions about the "13-page report" and wanted to know "if the inspector general was asked or pressured by anyone to edit down and remove numerous details about the violations that he says were founded." This same story concluded that "[i]n a more extensive and detailed version of the report that was made public last year, Inspector General Michael Westfall . . . found that Chapman doctored board meeting minutes, which falls under the law regarding false entries – a Class One misdemeanor." Chapman pleaded that this statement was defamatory.

A year later, Chapman filed a defamation suit against Burkett and Scripps Media Company. Burkett demurred. The trial court sustained the demurrer, finding that Chapman failed to plead actual malice. A first amended complaint met the same fate. Here, we review the trial court's determination that Chapman's second amended complaint also fails to plead actual malice.

## ANALYSIS

The issue here is whether Chapman pleaded facts sufficient to allege actual malice as part of her claims for defamation. We review the circuit court's decision to grant the demurrer on this basis de novo. *Schaecher v. Bouffault*, 290 Va. 83, 91 (2015). "A demurrer accepts as true all facts properly pled, as well as reasonable inferences from those facts." *Id.* (quoting *Steward v. Holland Fam. Props., LLC*, 284 Va. 282, 286 (2012)). While we "accept as true unstated

inferences to the extent that they are *reasonable*, we give them no weight to the extent that they are *unreasonable*." *Patterson v. City of Danville*, 301 Va. 181, 197 (2022) (quoting *Doe ex rel. Doe v. Baker*, 299 Va. 628, 641 (2021)). "The difference between the two turns on whether 'the inferences are strained, forced, or contrary to reason,' and thus properly disregarded as 'arbitrary inferences.'" *Id.* (quoting *Baker*, 299 Va. at 641).

There are three elements of defamation by publication: "(1) publication of (2) an actionable statement with (3) the requisite intent." *Schaecher*, 290 Va. at 91 (quoting *Tharpe v. Saunders*, 285 Va. 476, 480 (2013)). There is no dispute that the statements were published. As to whether these were actionable statements, Chapman argues that there is a substantial difference between describing a report as "preliminary" and as a "draft," and referring to it as the "original" and a "more extensive and detailed version." Awarding Chapman every reasonable inference, we agree that Burkett's characterization of the draft report as the "original" and "more extensive" report suggested that it contained the real, unedited, and true conclusions of OSIG. Because these same conclusions were omitted from the final report, we will assume without deciding that Chapman sufficiently pleaded that Burkett's repeated suggestions that the "original" conclusion of OSIG was that she committed a crime were false and defamatory, making them actionable statements. *See Schaecher*, 290 Va. at 103.

Turning to intent, the parties agree that Chapman was a public figure because she was the Board Chair at the time the alleged defamatory statements were made. Chapman was therefore required to plead actual malice to satisfy the intent requirement. *Jordan v. Kollman*, 269 Va. 569, 576-77 (2005) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).

Actual malice exists when a defamatory statement is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Jackson v. Hartig*, 274 Va. 219, 228 (2007) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 728 (1968)). A "reckless disregard

- 6 -

for the truth . . . requires more than a departure from reasonably prudent conduct." *Jordan*, 269 Va. at 580 (alteration in original) (quoting *Harte-Hanks Comm'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)). Indeed, the Supreme Court has explained, "there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication . . . [and] that the defendant actually had a high degree of awareness of probable falsity." *Id.*

Chapman argues that either Burkett knew that his statements were false, or that he acted with reckless disregard when he made such statements. In making this allegation, Chapman concedes that there was an earlier version of the OSIG report that concluded that she committed a criminal offense. What is more, she never contends that Burkett invented new details or misquoted the draft report. Instead, because the final report did not include this same conclusion, Chapman alleges that Burkett's reporting describing this earlier report as the "original" or "more extensive and detailed version of the report" was false.

The question is then whether Chapman sufficiently pleaded that Burkett knew or should have known that the final report omitted the conclusion from the draft report (that Chapman had committed a criminal offense) because that finding was incorrect, and not for some other reason. Notably, Chapman did not plead that OSIG *actually* changed the report because the original recommendation was unfounded or incorrect. She only pleaded that Burkett knew or should have figured out that this is what happened, within the two days after he received a copy of the draft report.

First, Chapman argues that she sufficiently pleaded Burkett's state of mind by identifying the discrepancies between the draft and final report. She notes that the draft report not only predated the final report, but that it also was unsigned, contained typographical differences,

lacked the statement of confidentiality at the bottom, and made allegations that were omitted from the final report.

Merely pleading that there were differences between the two reports does not show that Burkett knew, or should have known, that the draft report contained recommendations that were unfounded and false. Burkett did not hide the differences between the two reports. Indeed, he reported on the very differences that Chapman now relies on—that the draft version pre-dated the final report, that there were visible differences (such as blacked out text), and that it contained allegations that had been edited out before the final version was released. In fact, the differences between the two reports *was* the story. A final report may differ from an earlier draft for any number of reasons. Far from demonstrating that a reporter should have known why the draft version was changed, Chapman affirmatively pleaded that another reporter, Sarah Rankin, reviewed both versions and stated that the grounds for "the substantial differences in the content were not immediately clear." Chapman has failed to plead any reason why Burkett should have concluded that the report was changed because the draft contained false information, when another reporter could not determine why there were "substantial differences in the content."

Chapman also argues that because she was not charged with a crime, Burkett knew, or should have realized, that the draft report's recommendation that she be charged with a crime was inaccurate or incorrect. For support, Chapman latches onto a single phrase from *WJLA–TV v. Levin*, 264 Va. 140, 153 (2002). In *Levin*, our Supreme Court reviewed a jury's conclusion that WJLA-TV had actual malice when it reported that a physician had repeatedly sexually assaulted his patients, even though the Virginia Board of Medicine had investigated the allegations against him and concluded no criminal charges could be sustained. *Id.* at 156. In that context, the fact that "no criminal charges had been brought against [the physician]," after the Board of Medicine had affirmatively concluded no criminal charges were appropriate, was

relevant to finding WJLA-TV had actual malice. *Id.* Yet here, Burkett never reported that Chapman committed a crime, nor did he report that OSIG ultimately concluded that Chapman committed a crime. He merely reported that a conclusion in the "original" OSIG report was that Chapman had committed a criminal offense. Chapman concedes the draft report did in fact contain this finding. Thus, *Levin* does not control this analysis.

Next, Chapman argues that Burkett acted with reckless disregard concerning whether the draft report was false because he never spoke with the Inspector General or anyone within OSIG to authenticate the draft report. In making this argument, she draws from dated, out-of-jurisdiction precedent suggesting that actual malice may be based on a reporter's failure to investigate their claims. *See Babb v. Minder*, 806 F.2d 749, 755 (7th Cir. 1986) ("[R]eckless conduct may be evidenced in part by failure to investigate thoroughly and verify the facts . . . particularly where the material is peculiarly harmful or damaging to the plaintiff's reputation or good name." (alterations in original) (quoting *Fopay v. Noveroske*, 334 N.E.2d 79, 88 (Ill. App. 1975))). But the Supreme Court "emphatically rejected" this standard "in favor of the stricter *New York Times* actual malice rule." *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 666. Under the *New York Times* standard, to find that a reporter in a defamation suit acted with actual malice "on account of [his] failure to investigate the accuracy of an allegedly defamatory statement before publishing it," the court must find that "the defendant first 'had a high degree of awareness of [its] probable falsity.'" *Jackson*, 274 Va. at 229 (quoting *Shenandoah Publ'g House, Inc. v. Gunter*, 245 Va. 320, 324 (1993)). For the reasons already discussed above, Chapman failed to plead that Burkett knew that the findings in the draft report were false.

Finally, any argument that Chapman pleaded sufficient facts to show that Burkett should have known the draft report's conclusion was false is undermined by the rest of her own complaint. By pleading that the "13-page Draft Report had been submitted to someone *outside*

- 9 -

*of OSIG* for review and had been reduced to six pages *as a result of that review*," (emphases added), Chapman concedes that the draft report contained conclusions from OSIG and that some source *outside* of OSIG caused those conclusions to change.  This is precisely what Burkett reported.  As such, Chapman failed to plead that Burkett entertained, or should have entertained, serious doubts as to the accuracy of the draft report's conclusions.  *See Jordan*, 269 Va. at 581 (finding that the defendant did not have actual malice because he had an "honest conviction grounded in good-faith").

In short, we agree with the trial court that Chapman failed to allege that Burkett knew or should have known that the statements he reported from the draft OSIG report were false.  Thus, even making all warranted inferences in Chapman's favor, we hold that she failed to plead that Burkett had actual malice when he reported that the original OSIG report concluded that Chapman had committed a criminal offense.

## CONCLUSION

For these reasons, we affirm the trial court's decision to sustain Burkett's demurrer and dismiss Chapman's second amended complaint with prejudice.

*Affirmed.*